LOUIS POTEMKIN *vs.* OSCAR A. LEACH.

SAME *vs.* HARRY LEACH.

MAY 15, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J. These are actions on the case, the former against a young man and the latter against his father, to recover for personal injuries suffered by the plaintiff from the falling of a freight elevator in which he was then riding and which, until just a few moments before it fell, was being operated by Oscar A. Leach.

In the declaration in the former case it is alleged that the plaintiff was then riding on the elevator upon the invitation and request of the defendant and that the fall of the elevator was due to the negligence of the defendant in its operation. In the declaration in the latter case it is alleged that the plaintiff, at the time of the fall of the elevator, was riding on it upon the invitation and request of the defendant, his agents and servants. In some of the counts of that declaration the fall of the elevator is alleged to have been due to its negligent operation by the defendant, his agents and servants. In the other counts the fall is alleged to have been due to negligence by the defendant, his agents and servants in not using reasonable and proper care to see that the elevator apparatus was in safe and suitable condition for use as such.

By agreement the two cases were tried together before a justice of the superior court and a jury. At the conclusion of the evidence for the plaintiff each defendant made a motion that a nonsuit be ordered. The motion of Oscar A. Leach was denied, but that of Harry Leach was granted and a nonsuit was entered accordingly in the case against him.

Oscar A. Leach then rested his case without offering any evidence and made a motion that the jury be directed to return a verdict in his favor. This motion was denied and the case was submitted to the jury, who returned a verdict for the plaintiff against him for $30,000. In due time he filed a motion for a new trial, which was denied.

The case against him is now before us on his bill of exceptions, in which the exceptions that are pressed are one to the denial of his motion for the direction of a verdict in his favor and one to the denial of his motion for a new trial, based on the grounds that the verdict was against the weight of the evidence and that it was against the law.

The case against Harry Leach is before us on the plaintiff's bill of exceptions, in which the only exceptions now relied on are to the ruling of the trial justice in granting the defendant's motion for a nonsuit, and to three previous decisions of the superior court in sustaining the defendant's demurrer to the first count of the plaintiff's declaration, in striking out the eleventh count of the declaration, which was to the same effect, and in refusing to allow the plaintiff to reinstate that count or to file an additional count.

We shall first discuss the case against Oscar Leach, and in the discussion of it the word "defendant" will refer only to him. The facts, according to the evidence, are as follows: On January 22, 1932, Harry Leach, who carried on a business of buying and selling secondhand machinery, tools and the like, with a place of business in Providence in this state,

bought from the receiver of the Kirby Manufacturing Company nearly all the machinery, equipment, tools, dies, fixtures and other things which were at that time in the premises then and formerly owned and occupied by that corporation, being a certain four-story building in the city of Middletown, Connecticut.

In the bill of sale by which the receiver conveyed these articles to Harry Leach, it was agreed that the purchaser should have the use and occupation of these premises for a period of two months from January 22, 1932, without any charge. Until about the time of this sale the receiver had carried on, in this building, the business of the insolvent corporation. He testified that after the date of the sale he had nothing to do with the maintenance or upkeep of the building. On March 7, 1932 he quitclaimed the real estate to the Middletown Bank, which was the mortgagee of it.

Toward the end of February of that year Harry Leach told the plaintiff that he, the former, had just bought from a receiver a building-full of machinery and all kinds of tools and dies and that if the plaintiff was interested, he had better go to Middletown and look at them. The next day they went together to that city, walked up and down the stairs and over the floors of the building and looked at the contents; but the plaintiff bought nothing then.

A little later, about the middle of March, these two men made a second journey to the same premises and "walked all over the floors." There is nothing in the testimony which indicates that either of them was on the elevator. At that time the plaintiff bought a good many tools, dies and fixtures, and Harry Leach agreed to have them brought to Providence in his truck and to deliver them to the plaintiff there. The plaintiff, however, was to get them together and ready to be placed on the truck.

The plaintiff noticed then that the boiler was going and was told by Harry Leach that he had to keep it going as

long as he had possession of the building, in order to prevent the pipes from freezing. The plaintiff saw the elevator being used, by some men whom he did not know, for loading on machinery and bringing it down to the ground floor. There was a loading door near the foot of the elevator shaft and he saw the defendant and another employee of Harry Leach loading or unloading machinery.

Two or three days later, at Providence, Harry Leach told the plaintiff that the articles bought by the latter must be moved out of the building soon. When asked by the plaintiff who would deliver them to him at Middletown, Harry Leach's answer was that his son would be down there.

On March 23 the plaintiff went in his car to the building in Middletown and met there the defendant, who said that if the plaintiff would get his stuff together, the defendant would check it up and added: "and when you are ready we will take it down." At that time the defendant and another employee were loading other things from the elevator on the ground floor into a truck belonging to Harry Leach. The plaintiff then went to the different floors successively, walking up the stairs; and on each floor he brought his articles together near the elevator shaft.

He then returned to the third floor, where he saw the defendant operating the elevator and getting off from it at that floor. The defendant then said to him: "Are you ready?" and he replied that he was; and the defendant then said: "I will help you put it on the elevator" and asked if the plaintiff had some stuff on the fourth floor. When the latter replied that he had, the defendant said: "Let us put this stuff on first." So the plaintiff took two boxes and put them on the elevator and the defendant took two metal baskets and put them on top of the boxes. These all contained bowl cleaners.

Then the two of them walked in upon the elevator, the plaintiff stopping in the back of it, behind the boxes and

baskets, and the defendant stopping in the front of it, facing forward, with the control ropes of the elevator on his left. The plaintiff was near the corner farthest from these ropes. There were no gates or doors on the front of the elevator.

Then the defendant "pulled the ropes" and the elevator started upward and moved slowly, being a "slow motioned elevator." When the floor of the elevator was just about two or three inches or was within three or four inches of the floor of the fourth story of the building, the defendant pulled the ropes again; and when the two floors were on the same level, the defendant walked off the elevator. There is no evidence that he made any haste in doing so.

The plaintiff waited for the elevator to stop but it continued to go up. When it got about ten inches above the floor, he heard it strike something on top and then it went down and fell to the bottom of the shaft. As a result of its fall he suffered very serious injuries.

The foregoing was the entire substance of the plaintiff's own testimony of how the accident happened and of the pertinent events leading up to it; and there was no testimony from anyone else relating to how it happened, except that the physician who, beginning December 27, 1932, attended the plaintiff for the injuries resulting from this accident, testified that the plaintiff claimed to him that a cable broke on an elevator on which he was riding.

The defendant of course was not a common carrier or the employee of a common carrier, and was only under a duty to use, for the safety of the plaintiff, the care which the ordinary prudent man would use under the same or similar circumstances. There is no evidence that he had any actual knowledge or any notice, actual or constructive, that there was anything wrong with the elevator which would make its operation dangerous; and the sole reliance of the plaintiff is upon a failure by the defendant, in this situation, to use ordinary care in the operation of the elevator.

In our judgment the evidence shows that the plaintiff was rightfully on the elevator, as between him and the defendant, and that the latter was under a duty to use, in its operation, ordinary reasonable care for the safety of the plaintiff, but no more. In order that the plaintiff be entitled to recover from this defendant he must show by a fair preponderance of the evidence that the defendant failed to use such care; that if he had used it, the elevator would not have risen until it struck some obstruction; and also that an ordinary careful and prudent man in the same situation would have realized that a natural and probable consequence of his failure to stop the elevator would be an injury to the plaintiff. See *Prue* v. *Goodrich Oil Co.*, 49 R. I. 100, 140 A. 665.

The plaintiff contends in his brief that the Connecticut law applies to this case; but there was no evidence introduced that the law of that state in this matter was any different from that of Rhode Island. Hence, if the Connecticut law should be applied, we must assume that the applicable law of that state is the same as the law of this state on this subject. Therefore, we have made no investigation of the law of that state.

In considering the defendant's exception to the denial of his motion for the direction of a verdict in his favor, we must apply the well-established rule that all evidence favorable to the plaintiff must be accepted at its full value and that all inferences therefrom favorable to the plaintiff which are at all reasonable must be drawn. Applying this rule in this case we are of the opinion that we cannot properly hold that the jury, after accepting and giving full effect to all such evidence and to all reasonable inferences therefrom favorable to the plaintiff, could not reasonably make all the findings above stated. We therefore are of the opinion that the trial justice did not err in denying the defendant's motion that a verdict be directed in his favor.

But the rule which should govern a trial justice in passing upon a defendant's motion for a new trial after a verdict for the plaintiff, where the motion is based on the ground that the verdict is not supported by a preponderance of the evidence, is quite different from the rule applicable in passing upon a motion to direct a verdict for the defendant.

With regard to such a motion for a new trial, the trial justice should weigh all the pertinent evidence and consider the propriety of inferences to be drawn therefrom and the weight to be given to such inferences; and after doing so he should grant the motion, if in his sound judgment the verdict for the plaintiff is not supported by a fair preponderance of the evidence and of proper inferences therefrom and therefore fails to respond truly to the real merits of the controversy. *Nichols* v. *New England Tel. & Tel. Co.*, 57 R. I. 180, 185, 189 A. 14. If we find that the trial justice has followed this rule, we should reverse his decision if and only if we find that his decision was clearly wrong.

The first evidence that is relied on by the plaintiff as supporting a finding by the jury of negligence by the defendant is the evidence that though the defendant pulled the rope to stop the elevator at the fourth floor, it did not stop there, but continued to rise for about ten inches farther. This behavior of the elevator might have been caused by a failure by the defendant to pull the rope properly or by a defective condition of the elevator apparatus.

There is no direct evidence that the defendant pulled the rope improperly, but the plaintiff depends upon an inference that it was not pulled at the right time and in the right manner. The defendant had been operating the elevator during the day and there is nothing to indicate that he did not know how to operate it, or that he had not been operating it successfully; and there is no direct evidence that he had acted any differently, to stop it at the fourth floor a

few moments before the accident, from the way in which he had acted previously, to stop it at other floors when it was going up. Nor is there any evidence that the apparatus had not been working properly.

When, just before the accident, the floor of the elevator reached the level of the fourth floor of the building, the defendant got off, although the elevator was still moving; but, as testimony, above stated, shows, he did not jump off, but walked off and not in such a way as to alarm the plaintiff, who waited quietly for the stopping of the elevator, which, however, continued to rise for about ten inches. There was no testimony that either of the parties was alarmed before the elevator struck something above it and then started to fall.

The evidence above stated is all that is available to the plaintiff as a basis for his contention that he has proved, by a fair preponderance of the evidence, that the defendant was negligent in the way in which he operated the elevator.

Even if it be assumed that the plaintiff has thus shown negligence of the defendant, he must also, in order that the verdict be sustained, have shown, by a fair preponderance of the evidence, that such negligence was the proximate cause of the plaintiff's injuries. There is no direct evidence bearing on the issue whether an ordinary careful and prudent man in the same situation as the defendant would have realized that a natural and probable consequence of his failure to stop the elevator would be an injury to the plaintiff.

In this case the decision of the trial justice in denying the defendant's motion for a new trial, while not as helpful to us as it might be, is interpreted by us as an approval of the verdict. Therefore, after giving to it the weight ordinarily accorded to such a decision and after considering the evidence on the merits of this case and the inferences that in our judgment may properly be drawn therefrom, we are

of the opinion that he was clearly wrong in not granting the defendant's motion for a new trial.

This leaves for consideration the second of these cases, the one against the defendant Harry Leach. In that the trial justice ordered a nonsuit to be entered against the plaintiff, on the ground that the evidence would not support a finding by the jury that Oscar Leach, in operating the elevator *with the plaintiff upon it,* was doing so as an employee of Harry Leach and within the scope of his employment as such employee. In discussing this case we shall refer to Harry Leach as the defendant.

It is clear that the evidence did not show any express authority from the defendant to Oscar Leach to permit the plaintiff or anyone not in the employment of the defendant to ride on this freight elevator. There is no evidence that it ever had been used before except for the carriage of freight.

It is contended for the plaintiff that the evidence supports an inference that Oscar Leach had "general and extensive authority in the conduct of the business of Harry Leach." But we find no evidence which would justify such an inference.

It is further contended for the plaintiff that the jury would be justified in inferring broad powers in Oscar Leach, in connection with the handling of the articles purchased by the plaintiff, from the evidence that when the plaintiff asked the defendant who was going to deliver these articles when the plaintiff went for them, the only reply by the defendant was: "My son will be down there."

But in our opinion this evidence cannot be stretched so as to cover an authority in Oscar Leach to do anything more than to admit the plaintiff to the building and to deliver to him these articles. To our minds it does not justify any inference that Oscar Leach had authority to permit the plaintiff to ride on the elevator.

As above stated, the plaintiff and the defendant had gone all through the building on two previous occasions, and on the second the plaintiff had seen someone use the elevator for moving some machinery; but there is no evidence that there was anyone on it except the operator. And there is nothing to indicate that the plaintiff and the defendant used the elevator at all on either of these occasions. Apparently they went all over the building, using only the stairways to go from one floor to another.

After considering all the evidence that could have any bearing on this question and considering also all the arguments made in behalf of the plaintiff thereon, we are of the opinion that there was no evidence from which an inference could reasonably be drawn that Oscar Leach had any authority from the defendant, express or implied, to permit the plaintiff to ride on this freight elevator, as he did. Unless such authority could reasonably be found, no verdict against the defendant could be justified.

We therefore find that the trial justice was fully warranted in granting the motion of the defendant Harry Leach that the plaintiff be nonsuited.

This disposes of the principal exception relied on by the plaintiff. We have considered all of the comparatively few other exceptions which have been relied on before us in the plaintiff's brief or oral argument and find that they are immaterial in view of the above ruling on the state of the evidence. The other exceptions not so relied on before us we deem to have been waived.

In the case against Oscar A. Leach, the defendant's exception to the denial by the trial justice of the defendant's motion for the direction of a verdict in his favor is overruled. His exception to the denial by the trial justice of the motion for a new trial is sustained, and the case is remitted to the superior court for a new trial.

In the case against Harry Leach, all of the plaintiff's exceptions not waived are overruled, and the case is remitted to the superior court for entry of judgment on the nonsuit.

*Max Winograd, Marshall B. Marcus,* for plaintiff.

*Herman J. Aisenberg, William A. Gunning, Martin M. Zucker,* for defendant.