# IN THE SUPREME COURT OF PENNSYLVANIA
## WESTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| MARY ANN PROTZ, | : | No. 6 WAP 2016 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court entered |
| | : | September 18, 2015 at No. 1024 CD |
| v. | : | 2014, vacating the Order of the |
| | : | Workers' Compensation Appeal Board |
| | : | entered May 22, 2014 at No. A13-0096 |
| WORKERS' COMPENSATION APPEAL | : | and remanding with instructions. |
| BOARD (DERRY AREA SCHOOL | : | |
| DISTRICT), | : | ARGUED: November 1, 2016 |
| | : | |
| Appellees | : | |
| | : | |
| MARY ANN PROTZ | : | No. 7 WAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court entered |
| | : | September 18, 2015 at No. 1024 CD |
| | : | 2014, vacating the Order of the |
| WORKERS' COMPENSATION APPEAL | : | Workers' Compensation Appeal Board |
| BOARD (DERRY AREA SCHOOL | : | entered May 22, 2014 at No. A13-0096, |
| DISTRICT) | : | and remanding with instructions. |
| | : | |
| | : | ARGUED: November 1, 2016 |
| APPEAL OF: DERRY AREA SCHOOL | : | |
| DISTRICT | : | |

## OPINION

**JUSTICE WECHT**                 **DECIDED: JUNE 20, 2017**

Section 306(a.2) of the Workers' Compensation Act allows employers to demand that a claimant undergo an impairment-rating evaluation (IRE), during which a physician must determine the "degree of impairment" that is due to the claimant's compensable

injury. *See* 77 P.S. § 511.2(1). In order to make this assessment, the Act requires physicians to apply the methodology set forth in "the most recent edition" of the American Medical Association (AMA) *Guides to the Evaluation of Permanent Impairment. Id.* In these consolidated appeals, we consider whether this mandate violates the constitutional requirement that all legislative power "be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, § 1. We hold that it does.

In 2007, Mary Ann Protz sustained a work-related knee injury. Shortly thereafter, her employer, Derry Area School District (Derry), voluntarily began paying temporary total disability benefits. In October 2011, Protz underwent an IRE at Derry's request. The IRE physician evaluated Protz and assigned to her a 10% impairment rating based upon the Sixth Edition of the American Medical Association *Guides to the Evaluation of Permanent Impairment* (the *Guides*).[1] Because Protz's impairment rating was less than 50%, Derry filed a modification petition seeking to convert Protz's disability status from total to partial—the effect of which would be to limit the duration that Protz could receive workers' compensation benefits.[2] *See* 77 P.S. § 511.2(2) (providing that a claimant with "a threshold impairment rating that is equal to or greater than fifty per centum" is presumed to be totally disabled); 77 P.S. § 511.2(7) (limiting partial disability payments

---

[1] When Section 306(a.2) was enacted in 1996, the Fourth Edition of the *Guides* was the "most recent edition." Since then, the *Guides* have undergone two major revisions, the Fifth Edition (in 2001) and the Sixth Edition (in 2008).

[2] If an employer requests an IRE within sixty days of the claimant's receipt of 104 weeks of total-disability benefits, and the IRE yields an impairment rating of less than 50%, the IRE is self-executing, meaning that the claimant's disability status can be modified from total to partial without the involvement of a Workers' Compensation Judge. 77 P.S. § 511.2(1)-(2). Because Derry requested the instant IRE well beyond that timeframe, Derry could not automatically modify Protz's disability status. *See Gardner v. W.C.A.B. (Genesis Health Ventures)*, 888 A.2d 758 (Pa. 2005).

to five hundred weeks). After holding a hearing on Derry's modification petition, a Workers' Compensation Judge (WCJ) ruled that Protz's whole-body impairment was less than 50%, and accordingly granted the petition.

Protz appealed to the Workers' Compensation Appeal Board, arguing that the General Assembly unconstitutionally delegated to the AMA the authority to establish criteria for evaluating permanent impairment. *See* PA. CONST. art. II, § 1 ("[T]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."). The Board rejected Protz's constitutional argument and affirmed the WCJ's decision.

Protz appealed to the Commonwealth Court, where she again argued that Section 306(a.2) of the Act violates Article II, Section 1 of the Pennsylvania Constitution. The Commonwealth Court, sitting *en banc*, reversed the Board's decision. The *en banc* panel agreed with Protz that Section 306(a.2)'s requirement that physicians use "the most recent edition" of the *Guides* violates Article II, Section 1. Writing for the four-judge majority, Senior Judge Dan Pellegrini recited the basic principle that the General Assembly alone has the power to make laws, and it cannot constitutionally delegate that power to any other branch of government or to any other body. *Protz v. W.C.A.B. (Derry Area Sch. Dist.)*, 124 A.3d 406, 412 (Pa. Cmwlth. 2015).

The court acknowledged that, despite this seemingly broad prohibition, "the General Assembly may delegate authority and discretion in connection with the execution and administration of a law to an independent agency or an executive branch agency where the General Assembly first establishes primary standards and imposes upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the enabling legislation." *Id.* at 413 (citing *Blackwell v. Commonwealth, State Ethics Commission*, 567 A.2d 630, 637 (Pa. 1989)). The court

explained that, when the legislature chooses to so delegate, two critical limitations apply: first, "the basic policy choices must be made by the [l]egislature;" and second, "the legislation must contain adequate standards which will guide and restrain the exercise of the delegated administrative functions." *Id.* (citing *Gilligan v. Pa. Horse Racing Commission*, 422 A.2d 487, 489 (Pa. 1980)).

Applying this test, the Commonwealth Court concluded that "the Act is wholly devoid of any articulations of public policy governing the AMA," and that the Act lacks "adequate standards to guide and restrain the AMA's exercise" of its delegated power to create a methodology for grading impairment. *Id.* at 415. Instead, the court remarked, the General Assembly bestowed upon the AMA "carte blanche authority to implement [the AMA's] own policies and standards," which are then automatically adopted, sight unseen. *Id.* at 416.

The court went on to explain that, even if the General Assembly had included "adequate standards" to "guide and restrain" the AMA's exercise of delegated authority, Section 306(a.2) still would be unconstitutional because the AMA is a private organization. Along these lines, the court noted that:

> Unlike governmental agencies which are supposed to act disinterestedly and only for the public good, that presumption cannot be made with regard to private entities. There is no accountability to the public, either directly through the rulemaking process providing for public input and comment or indirectly through the appointment and confirmation power and the power of the purse. More simply, the keystone behind the prohibition against unlawful delegation is that the General Assembly, not private bodies, enacts laws which the government agencies implement in accordance with the standard given to them in the enactment.

*Id.*

Rather than striking all of Section 306(a.2), or undertaking a severability analysis, the Commonwealth Court declared the law unconstitutional only "insofar as it proactively approved versions of the AMA *Guides* beyond the Fourth Edition without

review." *Id.* Consistent with that narrow remedy, the court remanded the instant matter to the WCJ with instructions to apply the Fourth Edition of the *Guides*, the version in existence when the General Assembly enacted Section 306(a.2) in 1996.

Judges Anne Covey and Robert Simpson each authored dissenting opinions. In Judge Simpson's view, Section 306(a.2) withstands constitutional scrutiny in light of the fact that "the General Assembly delegated initial impairment ratings to an independent, Pennsylvania-licensed, board-certified, clinically-active physician," not to the AMA itself. *Id.* at 417 (Simpson, J., dissenting). Judge Simpson also maintained that, because it would be impractical to expect the legislature to establish and constantly revise a set of standards for evaluating physical impairment, "the General Assembly may rely on the medical expertise of the AMA, a well-recognized independent authority, in expressing current, best-practice medical knowledge." *Id.* at 420. Finally, Judge Simpson observed that "other states have adopted and judicially upheld similar workers' compensation provisions requiring the use of the most recent edition of the AMA *Guides* in evaluating impairment in workers' compensation cases." *Id.* at 419 (citing *Madrid v. St. Joseph Hosp.*, 928 P.2d 250 (N.M. 1996) (rejecting a non-delegation challenge involving the New Mexico legislature's adoption of "the most recent edition" of the *Guides*)). Judge Covey joined Judge Simpson's dissent and authored a separate dissent addressing the majority's alternative holding that all delegations to private entities are unconstitutional.

Both parties filed petitions for allowance of appeal with this Court, which we granted. Derry takes issue with the Commonwealth Court's conclusion that the General Assembly's prospective adoption of "the most recent edition" of the *Guides* violates Article II, Section 1, whereas Protz argues that the Commonwealth Court, after finding

Section 306(a.2) to be unconstitutional, erred in remanding her case to the WCJ for application of the Fourth Edition of the *Guides*.

We begin with the non-delegation issue, as to which our standard of review is *de novo* and our scope of review plenary. *City of Phila. v. Fraternal Order of Police Lodge No. 5 (Breary)*, 985 A.2d 1259, 1269 n.13 (Pa. 2009). Because the parties' arguments largely reflect the views expressed in the majority and dissenting opinions below, we need not recite them at length. In short, Derry argues that the General Assembly is free to adopt current and future standards that are published by "a well-recognized independent authority." Brief for Derry at 28 (quoting *Protz*, 124 A.3d at 420 (Simpson, J., dissenting)). Protz, on the other hand, maintains that Section 306(a.2) violates the non-delegation doctrine embodied in our Constitution because it gives the AMA unfettered discretion over Pennsylvania's impairment-rating methodology. *See* Brief for Protz at 16.

Article II, Section 1 of the Pennsylvania Constitution states that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, § 1. That is why, when the General Assembly empowers some other branch or body to act, our jurisprudence requires "that the basic policy choices involved in 'legislative power' actually be made by the [l]egislature as constitutionally mandated." *Tosto v. Pa. Nursing Home Loan Agency*, 331 A.2d 198, 202 (Pa. 1975). This constraint serves two purposes. First, it ensures that duly authorized and politically responsible officials make all of the necessary policy decisions, as is their mandate per the electorate. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 291 (Pa. 1975) (plurality opinion). And second, it seeks to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power. *Id.*

At the heart of the non-delegation doctrine, which we have described as a "natural corollary" to the text of Article II, Section 1, is the tenet that the General Assembly cannot delegate "to any other branch of government or to any other body or authority" the power to make law. *Blackwell*, 567 A.2d at 636; *State Bd. of Chiropractic Exam'rs v. Life Fellowship of Pa.*, 272 A.2d 478, 480 (Pa. 1971). Or, as John Locke put it, legislative power consists of the power "to make laws, and not to make legislators." JOHN LOCKE, SECOND TREATISE OF GOVERNMENT 87 (R. Cox ed.1982). Indeed, the rule is essential to the American tripartite system of representative government. The framers of the Constitution believed that the integrity of the legislative function was vital to the preservation of liberty. *See Dep't of Transp. v. Ass'n of Am. Railroads*, ___ U.S. ___, 135 S.Ct. 1225, 1237 (2015) (Alito, J., concurring) ("The principle that Congress cannot delegate away its vested power exists to protect liberty."); *see also* The Federalist No. 47, at 301 (J. Cooke ed. 1961) (J. Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny.").

Although our Constitution generally forbids the delegation of "legislative power," it nonetheless permits the General Assembly, in some instances, to assign the authority and discretion to execute or administer a law. *Blackwell*, 567 A.2d at 637. When the General Assembly does so, the Constitution imposes two fundamental limitations. First, as mentioned, the General Assembly must make "the basic policy choices," and second, the legislation must include "adequate standards which will guide and restrain the exercise of the delegated administrative functions." *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 877 A.2d 383, 418 (Pa. 2005); *State Bd. of Chiropractic Exam'rs*, 272 A.2d at 481 (quoting *Chartiers Valley Joint Sch. v. Cty. Bd. of Sch. Dirs. of Allegheny Cty.*, 211 A.2d 487, 492-93 (Pa. 1965)). This means, to

borrow Chief Justice Taft's oft-quoted expression, that the law must contain some "intelligible principle to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

In many non-delegation cases, this Court also has stressed the importance of procedural mechanisms that serve to limit or prevent the arbitrary and capricious exercise of delegated power. *Tosto*, 331 A.2d at 203; *see W. Phila. Achievement Charter Elementary Sch. v. Sch. Dist. of Phila.*, 132 A.3d 957, 966 (Pa. 2016). In *Tosto*, for example, the statute at issue required that the administrative agency establish neutral operating procedures, develop standardized documents, and give the public notice of proposed agency rules and regulations before promulgating them. In upholding the law, we described these elements as "important safeguard[s] against the arbitrariness of *ad hoc* decision making." *Tosto*, 331 A.2d at 204.

Similarly, in *William Penn*, we upheld a tax enabling statute that delegated to the judiciary the power to assess whether certain local taxes were "excessive or unreasonable." *Wm. Penn Parking Garage, Inc.*, 346 A.2d at 291. There, a plurality of this Court found it significant that the General Assembly had assigned this task to the courts, rather than to an administrative body, because the very structure of the judiciary serves to protect against the arbitrariness of *ad hoc* decision making. In this regard, we emphasized that a trial court operating under the statute "must explain the grounds of its decision in a reasoned opinion which will serve as a precedent to guide decisions in future cases," and that "trial courts are subject to careful review by appellate courts to [e]nsure the general consistency of their actions with one another and to confine them within their proper sphere." *Id.* at 291-92.

This Court's most recent non-delegation decision involved a provision in the Public School Code, *see* 24 P.S. §§ 1-101 – 27-2702, that gave a five-member School

Reform Commission (comprised mostly of individuals appointed by the Governor) sweeping powers to improve the finances of distressed school districts. Among other things, the law delegated to the School Reform Commission the authority to suspend regulations of the State Board of Education and to suspend provisions of the Public School Code. *W. Phila. Achievement Charter Elementary Sch.*, 132 A.3d at 959. The General Assembly placed only minor restrictions upon the Commission's authority. First, the General Assembly put a few provisions of the Public School Code beyond the reach of the Commission's suspension power, most of which related to local school-board elections. Second, the General Assembly required that the Commission submit annually a report to the Governor and the Education Committees of both the House and the Senate detailing the progress made in fiscal and academic performance. Finally, individual members of the Commission, as public employees, could be removed by the Governor for "malfeasance or misfeasance." *Id.* at 971 (Baer, J., dissenting). This Court held that the law violated the non-delegation doctrine because it did not include concrete measures to channel the Commission's discretion to wield its suspension power, nor did it include safeguards to protect against arbitrary, *ad hoc* decision making, such as a requirement that the Commission hold hearings, allow for public notice and comment, or explain the grounds for its suspensions in a reasoned opinion subject to judicial review.

By any objective measure, the authority delegated to the AMA in Section 306(a.2) of the Workers' Compensation Act is even more broad and unbridled than that of the School Reform Commission in *West Philadelphia Achievement Charter Elementary School*. The General Assembly did not favor any particular policies relative to the *Guides'* methodology for grading impairments, nor did it prescribe any standards

to guide and restrain the AMA's discretion to create such a methodology.[3] Without any parameters cabining its authority, the AMA would be free to: (1) concoct a formula that yields impairment ratings which are so inflated that virtually every claimant would be deemed to be at least 50% impaired; or (2) draft a version of the *Guides* guaranteed to yield impartment ratings so miniscule that almost no one who undergoes an IRE clears the 50% threshold; or (3) do anything in between those two extremes. The AMA could add new chapters to the *Guides*, or it could remove existing ones. It could even create distinct criteria to be applied only to claimants of a particular race, gender, or nationality.[4]

---

[3] It is not even clear that the General Assembly, within the bounds of the Constitution, could meaningfully "guide" the AMA's discretion over the *Guides'* methodology. *See Agency for Intl. Dev. v. Alliance for Open Soc'y Intl., Inc.*, 570 U.S. ___, 133 S.Ct. 2321 (2013) (holding that the First Amendment prevents the government from forcing a private organization to profess publicly a viewpoint not held by the organization); *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, ___, 132 S.Ct. 2277, 2288 (2012) ("The government may not . . . compel the endorsement of ideas that it approves."); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) ("At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."). Furthermore, because the use of the *Guides* is not unique to Pennsylvania law (or even to workers' compensation law generally), it is doubtful that the AMA would take marching orders from any one state legislature. *See* AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 20 (6th ed. 2008) ("In the United States, 44 states, 2 commonwealths, and federal employee compensation systems (in about 90+% of US jurisdictions) either mandate or recommend using the *Guides* to measure impairment in workers' compensation claims.").

[4] To be clear, we have no reason to suspect that the AMA has exercised its authority in an arbitrary or unreasonable manner. *Cf. Amicus* Brief for The Insurance Federation of Pennsylvania & The American Insurance Association at 17 (arguing that the Commonwealth Court's opinion below portrays the AMA as "some shady, untrustworthy enterprise" and "reflects a surprising hostility towards the medical profession"). Our Constitution restricts the General Assembly's ability to delegate legislative authority regardless of the manner in which the recipient wields it. That the AMA has opted to use its powers for good, so to speak, is no antidote.

Consider also that the AMA could revise the *Guides* once every ten years or once every ten weeks. If the AMA chooses to publish new editions infrequently, Pennsylvania law may fail to account for recent medical advances. By contrast, excessive revisions would likely pose severe administrative headaches, inasmuch as the *Guides* automatically have the force and effect of law once published. As these hypotheticals illustrate, the General Assembly gave the AMA *de facto*, unfettered control over a formula that ultimately will determine whether a claimant's partial-disability benefits will cease after 500 weeks.

Equally problematic, the General Assembly did not include in Section 306(a.2) any of the procedural mechanisms that this Court has considered essential to protect against "administrative arbitrariness and caprice." *Tosto*, 331 A.2d at 203. The General Assembly did not, for example, require that the AMA hold hearings, accept public comments, or explain the grounds for its methodology in a reasoned opinion, which then could be subject to judicial review.[5] Further, the AMA physicians who author the *Guides* are, of course, not public employees who may be subject to discipline or removal.

---

[5] To the contrary, the AMA's revision process has been denounced for its lack of transparency. In a 2004 article, a group of physicians who authored a chapter of the Fifth Edition of the *Guides* offered the following critique.

> The paucity of research on the AMA system is striking, given the fact that evaluations based on it determine the allocation of billions of dollars in medical and wage replacement payments. In the absence of scientific data, the AMA system relies almost exclusively on the opinions of panels of medical consultants. Unfortunately, no details have been published about how the expert panels were selected or the processes they followed to reach decisions about impairment. Moreover, since several different groups of experts contributed to the AMA *Guides*[,] there are significant inconsistencies throughout the text. The combination of inadequate validation research and ambiguity regarding the expert panels makes it difficult for us or any other observers to determine which elements of the AMA system are well substantiated, and which ones need significant revision.

(continued...)

Echoing Judge Simpson's dissent, Derry argues that the General Assembly restrained the AMA's authority by mandating that that all IREs be performed by a Pennsylvania-licensed, clinically active physician. *See* Brief for Derry at 27. We fail to see how this does anything to prevent the AMA from acting arbitrarily. Again, Section 306(a.2) provides that "[t]he degree of impairment shall be determined based upon an evaluation by a physician . . . pursuant to the most recent edition of the [AMA] 'Guides to the Evaluation of Permanent Impairment.'" 77 P.S. § 511.2(1). Thus, the evaluating physician, who is constrained by law to follow the *Guides,* has no power to limit the AMA's delegated authority.

We also find unavailing Derry's suggestion that the General Assembly's prospective adoption of future editions of the *Guides* constitutes a "policy decision" to use the "the most up-to-date medical knowledge when making impairment assessments." Brief for Derry at 29, 33 (arguing that that the General Assembly made the "policy decision" to "apply the most up-to-date standards reflecting the most current medical thinking"). As an initial matter, we question Derry's portrayal of the *Guides* as merely a collection of medical knowledge. *See* Ellen Smith Pryor, *Flawed Promises: A Critical Evaluation of the American Medical Association's Guides to the Evaluation of Permanent Impairment,* 103 HARV. L. REV. 964 (1990) (stating that the *Guides,* "like any impairment rating scheme, [rest] in large part on important and difficult normative judgments"). More importantly, Derry's contention distills to a tautology: that the non-delegation doctrine, which exists to prevent the General Assembly from delegating its lawmaking authority, is not violated whenever the General Assembly "decides" to

_____

(...continued)
James P. Robinson, Dennis C. Turk & John D. Loeser, *Pain, Impairment, and Disability in the AMA Guides,* 32 J. L. MED. & ETHICS 315-16 (2004) (footnote omitted).

delegate its lawmaking authority. Because this reasoning would render the non-delegation doctrine a nullity, we must reject it.

This case involves one additional wrinkle not present in *West Philadelphia Achievement Charter Elementary School* or in *Tosto*. Here, unlike in those cases, the General Assembly delegated authority to a private entity, not to a government agency or body. Conceptually, this fact poses unique concerns that are absent when the General Assembly, for instance, vests an executive-branch agency with the discretion to administer the law. One such concern is that private entities are isolated from the political process, and, as a result, are shielded from political accountability.[6] Because of this, it is perhaps unsurprising that our precedents have long expressed hostility toward delegations of governmental authority to private actors. *Hetherington v. McHale*, 329

---

[6] With regard to the federal non-delegation doctrine, at least one United States Supreme Court Justice rejected the notion that the legislature can delegate authority to entities that are not accountable to the public.

> If rulemaking can be entirely unrelated to the exercise of judicial or executive powers, I foresee all manner of "expert" bodies, insulated from the political process, to which Congress will delegate various portions of its lawmaking responsibility. How tempting to create an expert Medical Commission (mostly M.D.'s, with perhaps a few Ph.D.'s in moral philosophy) to dispose of such thorny, "no-win" political issues as the withholding of life-support systems in federally funded hospitals, or the use of fetal tissue for research. This is an undemocratic precedent that we set—not because of the scope of the delegated power, but because its recipient is not one of the three Branches of Government.

*Mistretta v. United States*, 488 U.S. 361, 422 (1989) (Scalia, J., dissenting).

Although we do not know for certain why the General Assembly delegated to the AMA the task of creating and revising impairment-rating standards, it is not difficult to imagine that it simply viewed the never-ending task of adopting new impairment-rating standards as the type of "no-win" political issue (in the nonpartisan sense) that Justice Scalia described. *See* DAVID B. TORREY & ANDREW E. GREENBERG, WEST'S PA. PRAC., WORKERS' COMPENSATION § 6:51.70 (suggesting that the General Assembly sought to avoid "the thorny political issue of partial disability determination every time the AMA issued a new guidebook").

A.2d 250, 254 (Pa. 1974) (holding that the Constitution "prohibits delegation to private groups of the power to make governmental appointments"); *Olin Mathieson Chem. Corp. v. White Cross Stores, Inc., No. 6*, 199 A.2d 266, 267-68 (Pa. 1964) (holding that the General Assembly may delegate regulatory power to "responsible governmental agencies," but not to private persons). Venerable opinions of the Supreme Court of the United States have done so as well. *See e.g., Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) ("This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business."); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935) (remarking that the National Industrial Recovery Act, which conferred upon private parties the authority to promulgate rules of "fair competition," represented "delegation running riot") (Cardozo, J., concurring).

That said, our precedents to date have not unequivocally supported the Commonwealth Court's view that the General Assembly cannot, under any set of circumstances, delegate authority to a private person or entity. *See Protz*, 124 A.3d at 416. Notably, this Court occasionally has suggested in non-delegation cases that the traditional constitutional requirements (*i.e.*, "policy choices" and "adequate standards") are necessary whenever the General Assembly delegates its authority "to any other branch of government *or to any other body or authority*." *Blackwell*, 567 A.2d at 636 (emphasis added). For example, this Court has held unconstitutional a law that required all chiropractors seeking to renew their licenses to attend either a two-day conference held by the Pennsylvania Chiropractic Society (a private organization), or another "equivalent educational conference." *State Bd. of Chiropractic Exam'rs*, 272 A.2d at 479. In striking down that statute on non-delegation grounds, we recited the

general rule that the General Assembly must provide adequate standards to guide and restrain the exercise of delegated administrative functions. *Id.* at 481 (quoting *Chartiers Valley Joint Sch.*, 211 A.2d at 492-93). Put another way, we held that the statute in *State Board of Chiropractic Examiners* was unconstitutional because it delegated unchecked and unrestrained authority over chiropractic continuing education, not because the Chiropractic Society was a private organization. *Id.* at 481.

Although we highlight this tension in our jurisprudence, we need not resolve it today. As we have explained, Section 306(a.2) could not withstand constitutional scrutiny even if the AMA were a governmental body. *See supra*, at 9-11 (comparing the facts of this case to those in *West Philadelphia Achievement Charter Elementary School*, 132 A.3d 957). We merely caution that our holding today should not be read as an endorsement or rejection of the Commonwealth Court's view that the delegation of authority to a private actor is *per se* unconstitutional. Nor do we foreclose the distinct possibility that a more exacting form of judicial scrutiny is warranted when the General Assembly vests private actors with regulatory or administrative powers.

Having determined that the General Assembly unconstitutionally delegated lawmaking authority to the AMA, we now must consider whether the Commonwealth Court erred in remanding this case to the WCJ with instructions to apply the Fourth Edition of the *Guides.* Although the Commonwealth Court's rationale in this regard is not entirely clear, it appears that the court's holding was based upon the fact that the General Assembly, when it enacted Section 306(a.2) in 1996, *could have* incorporated by reference the Fourth Edition of the *Guides.*

According to Protz, the Commonwealth Court should have struck down Section 306(a.2) in its entirety. Protz notes that "the plain language of Section 306(a.2) contains no mention of the Fourth Edition of the AMA *Guides*; rather [it] simply mandates usage

of the 'most recent edition.'" Brief for Protz at 18. Thus, Protz concludes, "the Commonwealth Court essentially redrafted Section 306(a.2) in a manner that would, in the court's view, pass constitutional muster." *Id.* By contrast, Derry argues that the Commonwealth Court did not err in remanding to the WCJ with instructions to apply the Fourth Edition of the *Guides*. Derry underscores that the Commonwealth Court "believed that the primary flaw in the statute was not that it invoked [the *Guides*], but that there was no policy review or guidance for determining whether the most 'recent' edition should be applied." Brief for Derry at 44. Thus, Derry believes that the Fourth Edition of the *Guides* should govern IREs moving forward.

At the outset, it is important to clarify that the non-delegation doctrine does not prevent the General Assembly from adopting as its own a particular set of standards which already are in existence at the time of adoption. However, for the reasons we have explained, the non-delegation doctrine prohibits the General Assembly from incorporating, sight unseen, subsequent modifications to such standards without also providing adequate criteria to guide and restrain the exercise of the delegated authority. *Pennsylvanians Against Gambling Expansion Fund, Inc.*, 877 A.2d at 418.

In matters of statutory interpretation, the General Assembly has instructed us to assume that it "does not intend to violate the Constitution of the United States or of this Commonwealth." 1 Pa.C.S. § 1922(3). This means that, if a statute is reasonably susceptible of two constructions, one that would render it of doubtful constitutionality and one that would not, we must adopt the latter. *See Bricklayers of W. Pa. Combined Funds, Inc. v. Scott's Dev. Co.*, 90 A.3d 682, 692 (Pa. 2014) ("[C]ourts give statutes a constitutional interpretation if that is reasonably possible.").

As a reminder, the relevant portion of Section 306(a.2) provides as follows:

The degree of impairment shall be determined based upon an evaluation by a physician who is licensed in this Commonwealth, who is certified by an American Board of Medical Specialties approved board or its

osteopathic equivalent and who is active in clinical practice for at least twenty hours per week, chosen by agreement of the parties, or as designated by the department, **pursuant to the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment."**

77 P.S. § 511.2(1) (emphasis added).

Doubtless, most would understand this language to mean that the IRE physician must use the edition of the *Guides* that is the most recent *at the time of the examination*. *See Stanish v. W.C.A.B. (James J. Anderson Const. Co.)*, 11 A.3d 569, 576 (Pa. Cmwlth. 2010) (holding that the "most recent edition" of the Guides is the most recent version in force at the time of the IRE). But, if the above language reasonably can be understood to mean that physicians should use the edition of the *Guides* that was the most recent edition *when the General Assembly enacted* Section 306(a.2) (*i.e.*, the Fourth Edition), we should adopt that construction instead. *Bricklayers of W. Pa., supra.*

Ultimately, however, we cannot accept that such a reading is a reasonable one. It beggars belief that the General Assembly would have used the words "most recent edition" when it really meant "Fourth Edition." Even more telling is that the General Assembly, in other sections of the Workers' Compensation Act, explicitly stated that the Fourth Edition of the *Guides* should govern. *See* 77 P.S. § 513(8)(i)-(iii) (providing that the "Impairment Guides" should be used to calculate the percentage of hearing impairment); 77 P.S. § 25.5 (defining the term "Impairment Guides" to mean "the American Medical Association's Guides to the Evaluation of Permanent Impairment, Fourth Edition"). This is important because we generally assume that, "where a section of a statute contains a given provision, the omission of such a provision from a similar section" signifies a different legislative intent. *Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 684 (Pa. 2009). The upshot of this is that we must construe the "most recent edition" requirement to mean the most recent edition in force at the time of

the IRE, a state of affairs that, for the reasons we have stated, violates the non-delegation doctrine.

Having concluded that the requirement that IRE physicians use the most recent version of the *Guides* is unconstitutional, we must decide whether it can be severed from the Workers' Compensation Act. The Act contains a severability provision, 77 P.S. § 1022, and, as a rule, the individual provisions of all statutes presumptively are severable. 1 Pa.C.S. § 1925. Nevertheless, we will decline to sever when, after the void provisions are excised, the remainder of the statute is incapable of execution in accordance with the General Assembly's intent. *See Stilp v. Commonwealth*, 905 A.2d 918, 972 (Pa. 2006).

Consistent with our holding, we must, at minimum, strike from Section 306(a.2) the unconstitutional "most recent edition" requirement. As demonstrated below, such references are pervasive.

> (1) When an employe has received total disability compensation pursuant to clause (a) for a period of one hundred four weeks, unless otherwise agreed to, the employe shall be required to submit to a medical examination which shall be requested by the insurer within sixty days upon the expiration of the one hundred four weeks to determine the degree of impairment due to the compensable injury, if any. The degree of impairment shall be determined based upon an evaluation by a physician who is licensed in this Commonwealth, who is certified by an American Board of Medical Specialties approved board or its osteopathic equivalent and who is active in clinical practice for at least twenty hours per week, chosen by agreement of the parties, or as designated by the department, ~~pursuant to the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment."~~

> (2) If such determination results in an impairment rating that meets a threshold impairment rating that is equal to or greater than fifty per centum impairment ~~under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment,"~~ the employe shall be presumed to be totally disabled and shall continue to receive total disability compensation benefits under clause (a). If such determination results in an impairment rating less than fifty per centum impairment ~~under the most recent edition of the American Medical~~

Association "Guides to the Evaluation of Permanent Impairment," the employe shall then receive partial disability benefits under clause (b): Provided, however, That no reduction shall be made until sixty days' notice of modification is given.

\* \* \* \*

(4) An employe may appeal the change to partial disability at any time during the five hundred-week period of partial disability; Provided, That there is a determination that the employe meets the threshold impairment rating that is equal to or greater than fifty per centum impairment under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment."

(5) Total disability shall continue until it is adjudicated or agreed under clause (b) that total disability has ceased or the employe's condition improves to an impairment rating that is less than fifty per centum of the degree of impairment defined under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment."

\* \* \* \*

(7) In no event shall the total number of weeks of partial disability exceed five hundred weeks for any injury or recurrence thereof, regardless of the changes in status in disability that may occur. In no event shall the total number of weeks of total disability exceed one hundred four weeks for any employe who does not meet a threshold impairment rating that is equal to or greater than fifty per centum impairment under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment" for any injury or recurrence thereof.

77 P.S. § 511.2 (footnotes omitted).

Although the prevalence of the offending language, of course, does not by itself preclude severance, excising only this language would render the remainder of Section 306(a.2) incomprehensible. As the above provisions make clear, the *Guides* are what provide critical context to the statute's otherwise hollow phrases, such as "the degree of impairment." *Id.* Without the aid of the *Guides* (or some other similar methodology), what could it possibly mean, for example, to say that a person has "a threshold impairment rating that is equal to or greater than fifty per centum impairment"? *Id.*

We view Section 306(a.2) as a paradigmatic example of a law containing valid provisions that are inseparable from void provisions. Consequently, we must strike

Section 306(a.2), in its entirety, from the Act. *See* 1 Pa.C.S. § 1925 ("[P]rovisions of every statute shall be severable . . . unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one.").

The Pennsylvania Constitution prevents the General Assembly from passing off to another branch or body *de facto* control over matters of policy. As we have explained, this is exactly what the General Assembly did in Section 306(a.2). Because we must enforce Article II, Section 1 without consideration of the exigencies that arise or "how trying our economic or social conditions become," we affirm the Commonwealth Court's holding that Section 306(a.2) violates the non-delegation doctrine. *Holgate Bros. Co. v. Bashore*, 200 A. 672, 675 (Pa. 1938). Unlike the Commonwealth Court, however, we hold that Section 306(a.2) is unconstitutional in its entirety.

Order affirmed in part and reversed in part.

Justices Todd, Donohue, Dougherty and Mundy join the opinion.

Chief Justice Saylor files a concurring opinion.

Justice Baer files a dissenting opinion.