**[J-94A-2018 and J-94B-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| GERMANTOWN CAB COMPANY, BUCKS COUNTY SERVICES, INC., CONCORD LIMOUSINE, INC., DEE DEE CAB COMPANY AND MCT TRANSPORTATION, INC., | : : : : : | No. 14 EAP 2018 |
| | : | Appeal from the Order entered on |
| | : | September 13, 2017 in the |
| | : | Commonwealth Court at No. 1989 CD |
| | : | 2016 (reargument denied 11/13/2017) |
| Appellees | : | reversing the Order entered on |
| | : | November 2, 2016 in the Court of |
| | : | Common Pleas, Philadelphia County, |
| v. | : | Civil Division at No. 00841 October |
| | : | Term 2015. |
| | : | |
| PHILADELPHIA PARKING AUTHORITY, | : | ARGUED:  December 5, 2018 |
| | : | |
| Appellant | : | |
| | | |
| GERMANTOWN CAB COMPANY, BUCKS COUNTY SERVICES, INC., CONCORD LIMOUSINE, INC., DEE DEE CAB COMPANY AND MCT TRANSPORTATION, INC., | : : : : : | No. 15 EAP 2018 |
| | : | Appeal from the Order entered on |
| | : | September 13, 2017 in the |
| | : | Commonwealth Court at No. 1990 CD |
| | : | 2016 (reargument denied 11/13/2017) |
| Appellees | : | reversing the Order entered on |
| | : | November 2, 2016 in the Court of |
| | : | Common Pleas, Philadelphia County, |
| v. | : | Civil Division at No. 00841 October |
| | : | Term 2015. |
| | : | |
| PHILADELPHIA PARKING AUTHORITY, | : | ARGUED:  December 5, 2018 |
| | : | |
| Appellant | : | |

**JUSTICE WECHT**                                                  **DECIDED: April 26, 2019**

With the enactment of Act 94[1] in 2004, the General Assembly transferred regulatory authority over Philadelphia taxicabs to the Philadelphia Parking Authority ("Authority"). Act 94 also created a budget submission process for the Authority to follow, and prescribed a formula that the Authority uses to ascertain assessments imposed upon Philadelphia taxicabs. In 2013, the Commonwealth Court found certain portions of Act 94 to be unconstitutional. *See MCT Transp. Inc. v. Phila. Parking Auth.*, 60 A.3d 899 (Pa. Cmwlth. 2013). The General Assembly then enacted Act 64[2] to cure the constitutional shortcomings identified by the Commonwealth Court. Partial rights taxicab owners in Philadelphia challenged the new scheme on constitutional grounds. The Commonwealth Court granted relief, finding that Subsection 5707(c) of the Parking Authorities Law, 53 Pa.C.S. § 5707(c), violates the substantive due process rights of partial rights taxicab owners. Additionally, the Commonwealth Court found that the budget submission process prescribed in 53 Pa.C.S. §§ 5707(a) and 5710 constitutes an unconstitutional delegation of legislative power.

This Court granted allowance of appeal in order to consider these two constitutional holdings. We conclude that the Commonwealth Court erred in both respects. Subsection 5707(c) does not impair the substantive due process rights of

---

[1]     Act of July 16, 2004, P.L. 758, No. 94; 53 Pa.C.S. §§ 5701-45.

[2]     Act of July 9, 2013, P.L. 455, No. 64.

partial rights taxicab owners. Nor do Subsections 5707(a) and 5710 amount to unconstitutional delegations of legislative power. Accordingly, we reverse.

## I. Background

Prior to 2005, the Pennsylvania Public Utility Commission ("PUC") regulated taxicabs in Pennsylvania. In March 2005, the General Assembly enacted Act 94, which amended Chapter 57 of the Parking Authorities Law to transfer regulatory and oversight authority for taxicabs operating in Philadelphia (the "City") from PUC to the Authority. *See Act of July 16, 2004, P.L. 758, No. 94; 53 Pa.C.S. §§ 5701-45; see generally Germantown Cab Co. v. Phila. Parking Auth.,* 993 A.2d 933, 934-35 (Pa. Cmwlth. 2010). There are two types of taxicabs subject to Authority regulation: medallion taxicabs, which have city-wide transportation rights, and partial rights taxicabs, which provide transportation in limited areas of the City. The PUC retained authority to regulate taxicabs operating outside the City and in the remainder of the Commonwealth. Consequently, Act 94 created a system of dual regulation by PUC and the Authority for partial rights taxicabs. While in the City, partial rights taxicabs are subject to Authority regulations. Outside the City, they are subject to PUC authority.

This legislative change reflected the General Assembly's finding that "[t]he health, safety and general welfare of the people of this Commonwealth" benefit from "the development of a clean, safe, reliable and well-regulated taxicab and limousine industry locally regulated by" the Authority. 53 Pa.C.S. §§ 5701.1(1), (2).[3]

---

[3] As the legislature explained:

Due to the size, total population, population density and volume of both tourism and commerce of a city of the first class, it may be more efficient to

Initially, the version of Subsection 5707(b) enacted by Act 94 created a process by which the Authority would establish a budget and fee schedule according to what was "necessary to advance the purposes of this chapter," and would submit this budget and fee schedule to the Appropriations Committees of the Pennsylvania Senate and the Pennsylvania House of Representatives by March 15 of each year. 53 Pa.C.S. § 5707(b) (2004). Unless the Appropriations Committees adopted a disapproval resolution by April 15, the Authority's budget and fee schedule would become effective.

In *MCT Transportation*, the Commonwealth Court held that this process constituted an unconstitutional delegation of legislative power because it granted the Authority the power to formulate its own budget and fee schedule without restriction or guidance from the General Assembly. *See MCT Transp.*, 60 A.3d at 914-15. In this respect, the Commonwealth Court rejected the argument that the legislative mandate to spend whatever was "necessary to advance the purpose of this chapter" limited the Authority's creation of its budget and fee schedule. 53 Pa.C.S. § 5707(b) (2004); *see MCT Transp.*, 60 A.3d at 914. Similarly, the Commonwealth Court found that the Appropriations Committees' power to disapprove of the Authority's budget did not suffice to pass constitutional muster under the non-delegation doctrine.

---

regulate the taxicab and limousine industries through an agency of the Commonwealth with local focus than an agency with diverse Statewide regulatory duties. Well-regulated local focus on improving those industries can be an important factor in the continual encouragement, development, attraction, stimulation, growth and expansion of business, industry, commerce and tourism within a city of the first class, the surrounding counties and this Commonwealth as a whole.

53 Pa.C.S. § 5701.1(3).

Finally, the Commonwealth Court contrasted the procedure established by Subsection 5707(b) with the constitutionally-mandated state agency budget process. *See MCT Transp.*, 60 A.3d at 906-10; Administrative Code of 1929, 71 P.S. § 230. This process commences when the Governor submits a proposal to the General Assembly for enactment. PA. CONST. art VIII, § 12. Pursuant to the Administrative Code of 1929, the General Assembly responds to the Governor's proposal by promulgating an appropriations bill, obtaining bicameral consideration and approval, and, ultimately, submitting the legislation for the Governor's signature. *See MCT Transp.*, 60 A.3d at 907; 71 P.S. § 230. Because Subsection 5707(b) did not adhere to this process, the Commonwealth Court found that it could not survive a constitutional challenge. *See MCT Transp.*, 60 A.3d at 914 ("[O]ur Constitution provides for an elaborate budgeting process that requires 'inquiries and investigations' by the Governor before a budget request is even submitted to the legislature for its review. . . .").

In July 2013, the General Assembly enacted Act 64 to amend the Parking Authorities Law in response to *MCT Transportation*. In particular, Act 64 established a new process for setting the Authority's budget and fee schedule and for calculating the individual taxicab assessment that is central thereto by amending Sections 5707 and 5708 and adding Sections 5707.1 and 5710 to the Parking Authorities Law.

Section 5707 outlines the budget submission process, the Authority's obligation to keep its records open to inspection, and the calculation of assessments. Subsection 5707(a) requires the Authority to submit a proposed budget and fee schedule to the

General Assembly, through the Governor, pursuant to the Administrative Code of 1929.[4]

This proposal will consist of amounts "necessary for the administration and enforcement

---

[4]     Subsection 5707(a) provides as follows:

(1) The authority shall prepare and, through the Governor, submit annually to the General Assembly a proposed budget consistent with Article VI of the act of April 9, 1929 (P.L. 177, No. 175), known as The Administrative Code of 1929, consisting of the amounts necessary to be appropriated by the General Assembly out of the funds established under section 5708 (relating to funds) necessary for the administration and enforcement of this chapter for the fiscal year beginning July 1 of the following year. The authority shall be afforded an opportunity to appear before the Governor and the Appropriations Committee of the Senate and the Appropriations Committee of the House of Representatives regarding its proposed budget. Except as provided in section 5710 (relating to fees), the authority's proposed budget shall include a proposed fee schedule.

(2) The authority's proposed budget shall include an estimate of the amount of its expenditures necessary to meet its obligation to administer and enforce this chapter. The authority shall subtract from the expenditure estimate:

   (i) The estimated fees to be collected under section 5710 during the fiscal year.

   (ii) Money deposited into the regulatory fund as payment for assessments, fees or penalties and any other moneys collected pursuant to this chapter but not allocated during a prior fiscal year. Unallocated assessment revenue from a prior fiscal year shall be applied to reduce the portion of the total assessment applicable to the utility group from which the unallocated assessment originated.

   (iii) Money budgeted for disbursement from the medallion fund, if any, as part of the authority's estimated budget.

(3) The remainder so determined, herein called the total assessment, shall be allocated to and paid by the utility groups identified in subsection (c) in the manner prescribed.

(4) If the authority's budget is not approved by March 30, the authority may assess the utility groups on the basis of the last approved operating budget. At the time the budget is approved, the authority shall make any necessary

of this chapter" for the next fiscal year.  53 Pa.C.S. § 5707(a)(1).  The proposed budget must include a fee schedule for items such as vehicle inspections and bounced checks. *Id.*  The Authority's appropriation will be from two funds established by Section 5708: the Philadelphia Taxicab and Limousine Regulatory Fund ("Regulatory Fund"), and the Philadelphia Taxicab Medallion Fund ("Medallion Fund").  The Regulatory Fund is the Authority's primary operating fund, and consists of assessments, fees, penalties, and other payments the Authority collects.  *Id.* § 5708(a).  The Medallion Fund consists of revenue and fees earned from the sale of medallions and is also used by the Authority to administer and enforce taxicab regulations.  *Id.* § 5708(a.1).  After submitting its proposed budget, the Authority may appear before the Governor and the Appropriations Committees of the Senate and House of Representatives and defend its proposal.

To develop its proposed budget, the Authority must estimate the "expenditures necessary to meet its obligation to administer and enforce" Chapter 57.  *Id.* § 5707(a)(2). From that amount, the Authority subtracts the estimated fees it will collect during the fiscal year,[5] money remaining in the Regulatory Fund, and money budgeted from the Medallion

---

adjustments in the assessments to reflect the approved budget. If, subsequent to the approval of the budget, the authority determines that a supplemental budget is needed, the authority shall submit its request for that supplemental budget simultaneously to the Governor and the chairman of the Appropriations Committee of the Senate and the chairman of the Appropriations Committee of the House of Representatives.

53 Pa.C.S. § 5707(a).

[5]      Section 5710 authorizes the Authority to collect various fees necessary for the regulation of three utility groups.  53 Pa.C.S. § 5710.  These fees are deposited into the Regulatory Fund.

Fund. *Id.* § 5707(a)(2)(i)-(iii).  The remainder is the "total assessment."  *Id.* § 5707(a)(3).

The total assessment is allocated among and paid by the three utility groups that the

Authority regulates: taxicabs, limousines, and dispatchers.  *Id.* § 5707(a)(3).

Relevant to this case is the assessment allocated to the taxicab utility group, which

is established in Subsection 5707(c)(1).[6]  The taxicab utility group consists of medallion

taxicabs and partial rights taxicabs.  *Id.* § 5707(c)(1)(i).[7]  The portion of the total

---

[6]     Subsection 5707(c)(1) provides as follows:

(i) The taxicab utility group shall be comprised of each taxicab authorized
by the authority pursuant to sections 5711(c) (relating to power of authority
to issue certificates of public convenience) and 5714(a) and (d)(2) (relating
to certificate and medallion required).

(ii) On or before March 31 of each year, each owner of a taxicab authorized
by the authority to provide taxicab service on a non-citywide basis shall file
with the authority a statement under oath estimating the number of taxicabs
it will have in service in the next fiscal year.

(iii) The portion of the total assessment allocated to the taxicab utility group
shall be divided by the number of taxicabs estimated by the authority to be
in service during the next fiscal year, and the quotient shall be the taxicab
assessment. The taxicab assessment shall be applied to each taxicab in
the taxicab utility group and shall be paid by the owner of each taxicab on
that basis.

(iv) The authority may not make an additional assessment against a vehicle
substituted for another already in taxicab service during the fiscal year and
already subject to assessment as provided in subparagraph (iii). The
authority may, by order or regulation, provide for reduced assessments for
taxicabs first entering service after the initiation of the fiscal year.

(v) The taxicab assessment for fiscal years ending June 30, 2013, and June
30, 2014, shall be $1,250.

53 Pa.C.S. § 5707(c)(1).

[7]     *See* 53 P.S. § 5711(c)(2.1) (limiting to six the number of certificates of public
convenience available for partial rights taxicabs).

assessment allocated to the taxicab utility group is divided among the taxicabs that will be operating in that fiscal year. Each taxicab, regardless of kind, pays the same assessment. The amount of this individual assessment will depend upon the number of taxicabs that will operate in the City during the relevant fiscal year.

The number of medallion taxicabs that will be operating in the City during the fiscal year is easily ascertainable by the Authority, because each medallion is granted to a specific taxicab. While the statute permits 1,600 individual medallion taxicabs, it permits only six certificates of public convenience for partial rights taxicab owners. *Id.* § 5711(c)(2.1). Each partial rights taxicab owner operates a fleet of vehicles, and may operate an unlimited number of taxicabs under its certificate of public convenience. Moreover, owners are free to decide from year to year how many partial rights taxicabs will provide service in Philadelphia (and will thus be subject to the Authority's regulations and assessment), and how many taxicabs may operate exclusively outside of the City (and will thus be subject only to PUC's regulatory authority).

Because the Authority will not know from year to year how many partial rights taxicabs will be operating in the City, and, consequently, how many taxicabs it will be responsible for regulating, Subsection 5707(c)(1) provides a way for the Authority to ascertain this number. Before March 31 of each year, each partial rights taxicab owner is required to file a statement under oath estimating the number of taxicabs it will have in service in the next fiscal year. *Id.* § 5707(c)(1)(ii).[8] From this information, the Authority estimates the number of taxicabs that will be in service during the next fiscal year. The

---

[8] The Authority requires the owners' sworn statements to be on form PR-1, which directs the owners to "list the vehicles that you intend to register for the upcoming year." *See* 52 Pa. Code § 1011.3(h)(2)(ii).

Authority then divides the portion of the total assessment allocated to the taxicab utility group by this estimate. *Id.* § 5707(c)(1)(iii). The quotient is the individual taxicab assessment. *Id.*

Section 5707.1 requires the Authority to provide both a notice of assessment to each taxicab owner and an opportunity to challenge the assessment as excessive, erroneous, unlawful, or otherwise invalid. *Id.* § 5707.1(a), (b)(1). An administrative challenge to an assessment does not relieve the owner of the obligation to pay the assessment. *Id.* § 5707.1(b)(3). If a taxicab owner fails to pay the assessment, the Authority may revoke or suspend the owner's certificate of public convenience. *Id.* § 5707(d.1).

The dispute in this case involves the Authority's budget for the 2015 fiscal year (July 1, 2014 through June 30, 2015) ("FY 2015") and the resulting taxicab assessment. Pursuant to Subsection 5707(a), the Authority estimated the amount necessary to meet its obligation and to administer its regulatory authority at $7,572,123. Of that total, 89% was sought to regulate the taxicab utility group; 10% was sought for the limousine utility group; and 1% was sought for the dispatcher utility group. The Authority submitted a proposed budget for this amount to the Governor. On July 10, 2014, the General Assembly appropriated $7,572,000.

The amount allocated to the regulation of the taxicab utility group was $6,739,189. After deducting the estimated fees the Authority believed it would collect in FY 2015, money remaining in the Regulatory Fund, and a transfer from the Medallion Fund, the Authority determined that the total assessment allocated to the taxicab utility group was $2,438,973.

Having arrived at the total assessment, the Authority was left to estimate how many taxicabs would be in service in FY 2015. The Authority knew that there would be 1599 medallion taxicabs operating that year. To ascertain how many additional taxicabs would be operating in the City, the Authority turned to the PR-1 forms it received from all but one of the partial rights taxicab owners.[9] Collectively, the owners that submitted timely PR-1 forms identified thirty-three taxicabs for FY 2015.

Germantown, which operates a fleet of partial rights taxicabs in the City, and which holds a certificate of public convenience ("CPC") originally granted by PUC, failed to file a timely PR-1 form estimating the number of taxicabs it would have in service in FY 2015. This forced the Authority to estimate the number of taxicabs that would be in service without input from Germantown. The Authority considered several factors in arriving at its estimate: "(1) the unverified information submitted for fiscal year 2015 by partial rights-taxicabs, (2) information submitted in prior PR-1 filings by [Germantown], (3) [Germantown]'s failure to file a timely PR-1 for 2015 and, (4) the failure of partial-rights carriers to register any vehicles or pay any assessments from fiscal years 2010 to 2014." Appellant's Brief at 10.[10] From this information, the Authority estimated that there would be seventy-five partial rights taxicabs in operation in FY 2015.[11]

---

[9] According to the PR-1 forms, Dee Dee Cab Company listed one taxicab; MCT Transportation, Inc., listed ten taxicabs; Concord Limousine, Inc., listed ten taxicabs; and Bucks County Services, Inc., listed twelve taxicabs.

[10] The Authority's hearing officer found that the Authority considered "companies that operated in Philadelphia but did not file a PR-1; [that] medallion 1313 may be on the street in 2015; [and that the Authority] may sell a [wheelchair accessible vehicle] medallion in 2015." Opinion of the Philadelphia Parking Authority Taxicab and Limousine Division Hearing Officer, November 21, 2014, at 5; N.T. at 63.

[11] The Authority did not allocate any specific number to Germantown in particular.

Adding the estimated seventy-five partial rights taxicabs to the 1,599 medallion taxicabs, the Authority estimated that it would have 1,674 taxicabs in service in FY 2015. Dividing the total assessment allocated to the taxicab utility group, or $2,438,973, by the estimate of 1,674 taxicabs, the Authority determined that the individual taxicab assessment would be $1,457.

The estimate of 1,674 taxicabs was used solely to determine the individual taxicab assessment during the budgetary proceedings, which, as noted, ended on July 10, 2014, when the General Assembly approved the appropriation. After the Authority's budget was approved, the Authority assessed each partial rights taxicab operator pursuant to Section 5707.1 based upon the number identified in the PR-1 form. Because Germantown failed to file a timely PR-1 form, the Authority assessed it based upon the number of taxicabs it had identified in its most recent PR-1 form, which it filed for fiscal year 2014: 169.[12]

The Authority served notice of the assessments to all partial rights taxicab owners. On August 7, 2014, Germantown received notice that its assessment for FY 2015 was $246,233, based upon the Authority's estimate of 169 taxicabs multiplied by the individual assessment of $1,457. Thus, although the Authority had estimated that 1,674 taxicabs would be in service in FY 2015 for purposes of determining the individual assessment, it ultimately assessed a total of 1,801 taxicabs for FY 2015. Because there is no authority in the Parking Authorities Law to alter the quotient used to establish the individual assessment after March 31, the Authority made no adjustment to the individual taxicab

---

[12] Germantown filed its PR-1 form for fiscal year 2014 almost a year late, on March 14, 2015. This was just two weeks before it was required to file the FY 2015 PR-1 form.

assessment. Any extra money the Authority received would be deposited into the Regulatory Fund and carried over into the next fiscal year's budget.

Germantown reacted on August 11, 2014, by filing an untimely PR-1 form identifying 174 taxicabs. Germantown's owner later testified that he believed that the PR-1 form was simply to identify the fleet size, not to determine the individual assessment. Germantown indicated on the untimely PR-1 form that it reserved the right to change this number if the Authority sought to use it for assessment purposes. The Authority ignored this untimely filing.

Germantown and Bucks County Services did not pay the assessment. Consequently, the Authority placed Germantown out of service. Thereafter, Germantown attempted to amend its untimely PR-1 form to identify only twenty-five taxicabs.[13] Again, the Authority ignored this untimely effort.

Germantown filed a petition for review with the Authority pursuant to 53 Pa.C.S. § 5707.1(b)(1), challenging the assessment as excessive, erroneous, unlawful or otherwise invalid.[14] On January 15, 2015, the Adjudication Department of the Authority's Taxicab and Limousine Division recommended that Germantown's petition be denied. On September 22, 2015, the Authority denied Germantown's exceptions to the recommended decision, and affirmed the assessment. On further appeal, the trial court

---

[13] Had the Authority considered Germantown's untimely PR-1 form and sought to decrease the total number of taxicabs it would assess, it would have been left with a budgetary shortfall.

[14] Joining Germantown were the other partial rights taxicab owners, including Bucks County Services, Concord Limousine, Concord Coach USA, Rosemont Taxicab Company, Dee Dee Cab Company, and MCT Transportation. The Authority's hearing officer ultimately dismissed Rosemont Taxicab and Concord Coach USA from the litigation.

also affirmed the Authority's decision. Germantown and Bucks County Services appealed to the Commonwealth Court.

On September 13, 2017, a three-judge panel of the Commonwealth Court reversed the trial court and struck down the assessment procedure of Subsection 5707(c) as violating Germantown's and Bucks County Services' substantive due process rights, and struck down the budgeting process of Sections 5707 and 5710 as an unconstitutional delegation of legislative power. *Germantown Cab Co. v. Phila. Paking Auth.*, 171 A.3d 315 (Pa. Cmwlth. 2017).

In its substantive due process challenge, Germantown and Bucks County Services argued that the assessment scheme was unclear and vague because it did not define which partial rights taxicabs it should include on the PR-1 form and which taxicabs were subject to the individual assessment. Addressing this due process challenge, the Commonwealth Court held that a certificate of public convenience is a constitutionally protected property interest. It proceeded to examine whether the assessment scheme of Subsection 5707(c) was arbitrary and irrational. *Id.* at 327 (citing *Johnson v. Allegheny Intermediate Unit*, 59 A.3d 10, 21 (Pa. Cmwlth. 2012)).

Although the Commonwealth Court agreed with the Authority that Subsection 5707(c) furthered the legitimate governmental objective of regulating taxicab service within the City for the public's benefit, the Court was unable to discern a real and substantial relationship between this objective and the assessment scheme. In particular, the Commonwealth Court concluded that the General Assembly provided no guidance with respect to how a partial rights taxicab owner should estimate, on the PR-1 form, how many taxicabs it would have in service in the next fiscal year, and that the General

Assembly failed to instruct the Authority how to estimate the total number of partial rights taxicabs it would be regulating. In addition, the Commonwealth Court believed that, by assigning each taxicab the same individual assessment, Subsection 5707(c) failed to account for critical differences between medallion and partial rights taxicabs. These failures, according to the Commonwealth Court, rendered the legislation arbitrary and unreasonable and, therefore, violated Germantown's substantive due process rights.

Turning to the budget request process of Subsection 5707(a) and Section 5710, the Commonwealth Court held that these provisions unconstitutionally delegated legislative power. Although the Commonwealth Court believed that, with Act 64, the General Assembly had corrected some of the unconstitutional aspects of the prior legislation identified in *MCT Transportation*, the Court nonetheless held that the General Assembly had failed to establish any standards to guide or restrain the Authority's exercise of discretion in formulating its budget request and fee schedule, or to direct the Authority regarding how to allocate costs and expenses among the three utility groups. According to the Commonwealth Court, it was not sufficient that the General Assembly would review and approve the budget request and proposed fee schedule because there was no way to know what standards the Authority applied in formulating these proposals.

This Court granted the Authority's petition for allowance of appeal in order to consider whether Act 64 deprives partial rights taxicab owners of substantive due process, and whether that Act violates non-delegation principles. *Germantown Cab Co. v. Phila. Parking Auth.*, 184 A.3d 944, 944-45 (Pa. 2018) (*per curiam*). Constitutional challenges to legislative enactments present this Court with questions of law, as to which

our standard of review is *de novo* and our scope of review is plenary. *Lebanon Valley Farmers Bank v. Commonwealth*, 83 A.3d 107, 111 (Pa. 2013).

## II.     Substantive Due Process Challenge

Legislation enacted by the General Assembly enjoys a presumption of constitutionality. *See Pa. State Ass'n of Jury Comm'rs v. Commonwealth,* 64 A.3d 611, 618 (Pa. 2013); 1 Pa.C.S. § 1922(3) (presuming that "the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth"). "Accordingly, a statute will not be declared unconstitutional unless it clearly, palpably, and plainly violates the Constitution." *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 877 A.2d 383, 393 (Pa. 2005) (emphasis omitted). Any doubts about whether a challenger has met this high burden are resolved in favor of finding the statute constitutional. *Id.* We therefore presume that Subsection 5707(c) is constitutional, and assess whether the challengers have overcome this presumption.

Germantown and the other challengers raised a facial constitutional challenge to Subsection 5707(c). A statute is facially unconstitutional only where there are no circumstances under which the statute would be valid. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); *Clifton v. Allegheny Cty.*, 969 A.2d 1197, 1222 (Pa. 2009). In determining whether a statute is facially invalid, courts do not look beyond the statute's explicit requirements or speculate about hypothetical or imaginary cases. *Wash. State Grange*, 552 U.S. at 449-50.

Invoking the rational basis test to assess the constitutionality of legislation, the Authority asserts that, to withstand a substantive due process challenge, a statute must seek to achieve a valid state objective by means that are rationally related to that objective. *See Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004). Because the Commonwealth Court agreed that Subsection 5707(c) furthers a legitimate

state interest, the Authority focuses its argument upon disputing the Commonwealth Court's holding that Subsection 5707(c) is arbitrary or unreasonable, or lacks a substantial relationship to regulating taxicab service for the benefit of the public.

In this respect, the Authority argues that the General Assembly made a deliberate decision to assess medallion and partial rights taxicabs identically, a decision the Authority believes was eminently reasonable. Emphasizing that partial rights taxicab owners operate fleets, the Authority asserts that partial rights taxicabs have a large footprint in the City, often without the added costs applicable to medallion taxicabs, such as certified dispatchers, medallions, or modern taxicab meters. The General Assembly's decision to equalize assessments between the two groups was, according to the Authority, the result of a legislative recognition that all taxicabs providing service in the City and regulated by the Authority should share equally in the cost of the Authority's regulatory obligations.

Turning to the estimation process inherent in Subsections 5707(c)(1)(ii) (requiring taxicab owners to estimate the number of taxicabs they intend to operate) and 5707(c)(1)(iii) (requiring the Authority to estimate the number of taxicabs that will be in service), the Authority argues that neither requirement is, as the Commonwealth Court found, arbitrary or unreasonable. The owners' estimates are a business decision, while the Authority's estimation is meant to be a simple process of adding the number of medallions to the numbers of taxicabs identified by the partial rights taxicab owners.

Germantown responds by characterizing Subsection 5707(c)'s assessment scheme as arbitrary, unreasonable, and irrational, and, therefore, a violation of the substantive due process rights of partial rights taxicab owners. According to Germantown, the Commonwealth Court was correct in this respect because of the material differences that it perceives between medallion and partial rights taxicabs.

The due process clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Due process protections also emanate from the Pennsylvania Constitution, particularly Article I, Sections 1, 9, and 11. *Khan*, 842 A.2d at 945. Article I, Section 1 of the Pennsylvania Constitution provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." PA. CONST. art I, § 1. As this Court has explained, substantive due process is the "esoteric concept interwoven within our judicial framework to guarantee fundamental fairness and substantial justice." *Khan*, 842 A.2d at 946 (quoting *Commonwealth v. Stipetich*, 652 A.2d 1294, 1299 (Pa. 1995) (Cappy, J., dissenting)).

For substantive due process rights to attach, there must be a deprivation of a constitutionally protected interest or property right. *Khan,* 842 A.2d at 946. If the statute restricts a fundamental right, it is reviewed under strict scrutiny. If the statute impacts a protected but not fundamental right, then it is subject to rational basis review. *Khan*, 842 A.2d at 946-47; *Nixon v. Commonwealth*, 839 A.2d 277, 287 (Pa. 2003); *cf. Washington v. Glucksburg*, 521 U.S. 702, 721 (1997) (stating that, under federal precedent, legislation restricting a right that is not fundamental is subject to rational basis review).

Pursuant to Article I, Section 1, protected interests include the right of an individual to pursue his or her livelihood or profession. *Khan*, 842 A.2d at 945; *Nixon,* 839 A.2d at 288. We agree with the Commonwealth Court that a certificate of public convenience is a constitutionally protected property interest. The certificate is, essentially, a license to practice a livelihood or a profession, allowing the owners lawfully to operate their taxicabs

in Pennsylvania. Like other licensees, taxicab owners operating pursuant to a certificate of public convenience have a protected property right in that livelihood. *See Khan*, 842 A.2d at 946 (recognizing that a license to practice a particular profession vests in the licensed professional a protected interest in practicing that profession); *Bucks Cty. Servs., Inc. v. Phila. Parking Auth.*, 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), slip op., at 45-46 (holding that PUC's issuance of certificates of public convenience to partial rights taxicab owners was akin to the issuance of a license to practice a profession, creating a protected property interest in operating within the City); *MCT Transportation*, 60 A.3d at 915-19 (recognizing that partial rights taxicab owners have a protected property interest in their certificates of public convenience for purposes of procedural due process).

We further agree with the Commonwealth Court that, although the right to engage in a licensed profession is an important right, it is not a fundamental right. *See Nixon*, 839 A.2d at 288 (recognizing that the right to engage in a particular occupation is not a fundamental right). Because Germantown's right to operate its fleet of partial rights taxicabs does not impact a fundamental right, we must apply rational basis review. *See Khan*, 842 A.2d at 946-47.

From a historical perspective, the federal approach to substantive due process has evolved from the early days of the so-called *Lochner* Era, which lasted roughly from the turn of the twentieth century until the mid-1930s. During this era, the Supreme Court of the United States overturned a wide range of economic legislation on substantive due process grounds after finding that the legislation violated the freedom of contract, a freedom which, the Court believed, was included within the due process clause. *See, e.g.*, *Allgeyer v. Louisiana*, 165 U.S. 578, 589 (1897); *Lochner v. New York*, 198 U.S. 45 (1905) (holding that a statute regulating the number of hours bakery employees could work violated substantive due process). In *Lochner*, the Court held that only a valid

exercise of the state's police power, bearing a direct relationship to the protection of the welfare and safety of the public, could interfere with one's freedom of contract. *Lochner*, 198 U.S. at 53. Finding no relationship between the public health and legislation limiting the number of hours bakers could work, the *Lochner* Court held that the legislation was not a valid exercise of the state's police power. *Id.* at 57.

In reaching this conclusion, the *Lochner* Court declined to defer to the legislature's belief that the legislation was, in fact, necessary for public health and welfare. It went so far as to examine independently the reasonableness of the legislative decision. *Lochner*, 198 U.S. at 56 ("In every case that comes before this court, . . . the question necessarily arises: Is this a fair, reasonable, and appropriate exercise of the police power of the state . . . ?").[15]

The aggressive judicial review that characterized the *Lochner* era ultimately gave way to a more deferential approach to rational basis review when the Court upheld a minimum wage law and rejected freedom of contract as a substantive due process right. *See West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937); *see also Nebbia v. New York*, 291 U.S. 502, 510-11 (1934) (holding that as long as a rational basis existed for an economic regulation, it was not the court's prerogative to hold it unconstitutional). Instead, the Court held that the state could regulate economic activity for a legitimate

---

[15]    *See also Williams v. Standard Oil Co. of La.,* 278 U.S. 235, 245 (1929) (striking down a law regulating the retail price of gasoline); *Ribnik v. McBride*, 277 U.S. 350, 357-59 (1928) (invalidating fees charged by employment agencies); *Tyson & Bro. United Theatre Ticket Offices, Inc. v. Banton*, 273 U.S. 418, 445 (1927) (striking down a statue regulating the resale price of theater tickets); *Weaver v. Palmer Bros. Co.*, 270 U.S. 402, 415 (1926) (invalidating state law forbidding the use of certain cut-up fabrics); *Jay Burns Baking Co. v. Bryan*, 264 U.S. 504, 517 (1924) (overturning state law regulating the weight of loaves of bread); *Adkins v. Children's Hosp.*, 261 U.S. 525, 549 (1923) (striking down a minimum wage law for women); *Coppage v. Kansas*, 236 U.S. 1, 16 (1915) (invalidating a state law banning certain contracts); *Adair v. United States*, 208 U.S. 161, 174-75 (1908) (striking down a federal law forbidding the discharge of railroad workers for affiliation with a union).

state purpose, statutes are presumed to be constitutional, and state legislatures are entitled to deference. *See United States v. Carolene Prod. Co.*, 304 U.S. 144, 152 & n.4 (1938) (establishing two levels of judicial review and the Court's presumption of the constitutionality of rational laws); *see also Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955) ("The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.").

In more modern times, rational basis review has evolved not only to include the presumption of constitutionality and the deferential standard of review, but also to require an individual challenging legislation to show either that the legislation does not further a legitimate state interest, or that the legislation is not rationally related to this legitimate state interest. *See Glucksberg*, 521 U.S. at 728 ("The Constitution also requires, however, that Washington's assisted-suicide ban be rationally related to legitimate government interests."); *Romer v. Evans*, 517 U.S. 620, 635 (1996) ("[A] law must bear a rational relationship to a legitimate governmental purpose. . . .").

As this Court has explained, the right to practice one's chosen profession is subject to the lawful exercise of the Commonwealth's power to protect the health, safety, welfare, and morals of the public by regulating the profession. *Khan*, 842 A.2d at 949. Pursuant to the rational basis test, this Court requires social and economic legislation to be directed toward a valid state objective by means that are rationally related to that objective. *Id.* at 946. The fit between the legislative ends and the statutory means must be real and substantial. *See id.* ("The rational relationship standard of substantive due process by which legislation is judicially measured is that the statute or regulation at issue must have a real and substantial relationship to the object sought to be obtained."). In addition,

Pennsylvania balances the rights of the individual against the public interest. *Id*. at 946-47.

Rational basis review requires this Court to examine whether Subsection 5707(c) bears a rational relationship to a legitimate state purpose. Beginning with the state purpose, the Commonwealth Court recognized that Subsection 5707(c) furthers the legitimate governmental objective of regulating taxicab service in the City. *Germantown Cab Co.*, 171 A.3d at 327. Germantown does not disagree, and offers no argument contesting the legitimacy of this government interest.

The legislative objective in this case is clear, uncontested, and uncontroversial. Section 5701.1 establishes the relevant state interest: to promote the health, safety, and general welfare of the people of this Commonwealth, 53 Pa.C.S. § 5701.1(1); to encourage growth and development, *id*.; to develop "a clean, safe, reliable and well-regulated taxicab and limousine industry locally regulated" by the Authority, *id*. § 5701.1(2); and to improve efficiency through regulation by the Authority of all taxicabs in the City, *id*. § 5701.1(3).

We now turn to the means analysis: whether Subsection 5707(c) bears a rational relationship to these legitimate state objectives. The number of taxicabs operating in the City varies from year to year based in part upon the business decisions of partial rights taxicab owners. The Authority's regulatory obligations likewise change from year to year, as they are driven by the number of taxicabs under its regulatory jurisdiction. The General Assembly chose to impose the cost of regulation upon the regulated industry. It created a statutory scheme whereby each individual taxicab shares equally in financing this cost.

We agree with the Authority that having each taxicab that the Authority regulates contribute equally to the cost of that regulation is rationally related to the legitimate state purposes identified above. Each taxicab provides service in the City, is subject to the

Authority's regulatory authority, and is assessed by the Authority. Consequently, the General Assembly decided that each taxicab will contribute in equal measure to the cost of this locally-focused regulation. While there may be differences between medallion and partial rights taxicabs, they also bear a compelling similarity: each provides taxicab service to the public in the City and is regulated by the same entity. It is rational to spread the cost of regulation equally among the regulated entities and to link the individual assessment to the number of taxicabs operating in the City.

The legislature chose to assess medallion and partial rights taxicabs equally, rather than accounting for what Germantown and the Commonwealth Court believe to be material differences between the two types of taxicabs. *See* 53 Pa.C.S. § 5701 (defining "taxicab" to include both medallion and partial rights taxicabs); *id.* § 5707(c) (outlining the assessments for all taxicabs). This decision does not amount to a deprivation of substantive due process. We presume that the legislature investigated the differences and decided upon the measures that it believed would serve the public interest. *See Khan*, 842 A.2d at 947 ("[T]he General Assembly is presumed to have investigated the question and ascertained what is best for the good of the profession and the good of the people."). Partial rights taxicab owners provide service in much of the City every day, in addition to their areas of service outside the City. They operate in the City without many of the added costs associated with medallion taxicabs. The General Assembly rationally concluded that, by virtue of this provision of taxicab service in the City, the similarities overcame the differences.

Although equal assessments may have resulted in a heavier burden than partial rights taxicabs previously encountered, we must uphold the statute where, as here, the legislation is rationally related to the legitimate state interest of a clean, safe, reliable, and well-regulated taxicab industry. This was a matter of legislative policy prerogative.

Whether or not the statute is wise, or whether or not it is the best means to achieve the intended result, are matters for the General Assembly to determine. *See Khan*, 842 A.2d at 947.

We now turn to Germantown's argument that its substantive due process rights have been violated by the estimation processes inherent in Subsections 5707(c)(1)(ii) and (iii). The statutory language of Subsection 5707(c) is clear in establishing a procedure by which the Authority determines how many taxicabs it will regulate in the coming fiscal year. Each partial rights taxicab owner estimates for the Authority the number of taxicabs it intends to operate in the City. 53 Pa.C.S. § 5707(c)(1)(ii). From this information, the Authority estimates the total number of taxicabs under its jurisdiction and uses this number and the total assessment allocated to the taxicab utility group to determine the individual assessment. *Id.* § 5707(c)(1)(iii). The number of taxicabs operating in the City will change from year to year, which in turn will change the Authority's operating costs and, therefore, the individual assessment.

The taxicab owners' decision to estimate the number of taxicabs they intend to run is entirely a business decision left to the discretion of the owners. These owners are free to self-designate whatever number of taxicabs they determine, in their business judgment, to run in the City. By asking the business owners to self-designate this number, the statute has provided sufficient guidance and vested appropriate discretion in this business decision.[16]

This process is neither complex nor unclear. Businesses are familiar with their own business needs and the marketplace within which they operate, and they are equipped to make calculations in their own interest. Similarly, agencies routinely assess the financial costs of fulfilling their regulatory obligations. The only difficulty in the

---

[16] According to the Authority, taxicab owners can, and have, operated more or fewer partial rights taxicabs than the number they reported on their PR-1 form.

assessment scheme of Subsection 5707(c) arises when, as here, a partial rights taxicab operator refuses to comply with the statutory directive of providing the Authority with the number of taxicabs it intends to operate. In such circumstances, the Authority is left to estimate the number of taxicabs it will be responsible for regulating without input from the business owners subject to such regulations. But the statute, facially, presents no unconstitutional deprivation of a protected interest.

We reject Germantown's contention that a statute must succumb to a facial challenge when the statute, on its face, does not itself violate substantive due process. Germantown's argument is, essentially, that the statute did not account for what happened here, when Germantown itself chose to ignore its statutory obligation to furnish accurate information to the Authority. By ignoring this obligation, and by failing to comply with a facially constitutional statute, Germantown has itself created the deprivation of which it now complains.

Subsection 5707(c) bears a rational relationship to a legitimate state objective. It is, therefore, constitutionally valid under state and federal substantive due process. We reverse the Commonwealth Court's holding to the contrary.

## III. Delegation Challenge

Turning to Germantown's argument that Act 64 amounts to an unconstitutional delegation of legislative power, we observe that the separation of powers doctrine divides the functions of government equally between the executive, legislative, and judicial branches. *Jefferson Cty. v. Court Appointed Emps. Ass'n v. Pa. Labor Relations Bd.*, 985 A.2d 697, 702 n.8 (Pa. 2009). As we recently explained,

> Article II, Section 1 of the Pennsylvania Constitution states that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, § 1. That is why, when the General Assembly empowers some other branch or body to act, our jurisprudence requires "that the basic policy choices involved in 'legislative power' actually be made by the

[l]egislature as constitutionally mandated." *Tosto v. Pa. Nursing Home Loan Agency*, 460 Pa. 1, 331 A.2d 198, 202 (1975). This constraint serves two purposes. First, it ensures that duly authorized and politically responsible officials make all of the necessary policy decisions, as is their mandate per the electorate. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269, 291 (1975) (plurality opinion). And second, it seeks to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power. *Id.*

*Protz v. Workers' Comp. Appeal Bd. (Derry Area Sch. Dist.)*, 161 A.3d 827, 833 (Pa. 2017).

Although the legislature may not delegate legislative power, it may, in some instances, assign the authority and discretion to execute or administer a law, subject to two fundamental limitations: First, the General Assembly must make "the basic policy choices." *Id.* at 834. Once it does so, the General Assembly may "impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions" of the legislation. *Chartiers Valley Joint Schs. v. Cty. Bd. of Sch. Dirs. of Allegheny Cty.*, 211 A.2d 487, 492 (Pa. 1965). Second, the legislation must include "adequate standards which will guide and restrain the exercise of the delegated administrative functions." *Protz*, 161 A.3d at 834 (citing *Pennsylvanians Against Gambling Expansion Fund, Inc.*, 877 A.2d at 418; *State Bd. of Chiropractic Exam'rs v. Life Fellowship of Pa.*, 272 A.2d 478, 481 (Pa. 1971)). In determining whether the legislature has established adequate standards, "we are not limited to the mere letter of the law, but must look to the underlying purpose of the statute and its reasonable effect." *Commonwealth v. Cherney*, 312 A.2d 38, 41 (Pa. 1973). Further, the General Assembly does not delegate legislative powers by delegating mere details of administration. *Id.*; *Chartiers Valley Joint Schs.*, 211 A.2d at 492.

Based upon our jurisprudence on the question of legislative delegation, we must examine whether, in Section 5707, the General Assembly has, in the first instance, delegated legislative power. We have little difficulty in concluding that it has not. Rather, Section 5707 merely requires the Authority to create a proposed budget and fee schedule. This is quite unlike the prior version of the statute that the Commonwealth Court struck down in *MCT Transportation*, which essentially permitted the Authority to establish its own budget and fee schedule subject only to a disapproval resolution by the Appropriations Committees of the Pennsylvania Senate and House of Representatives.

Pursuant to Act 64, the Authority has no power to make appropriations to actualize this proposed budget. Rather, the General Assembly has mandated that the Authority's proposed budget is to be prepared and submitted pursuant to the process created in the Administrative Code of 1929. Section 230 of the Administrative Code of 1929 directs the Secretary of the Budget to provide every agency that desires state appropriations with instructions necessary for their preparation of budget requests. 71 P.S. § 230(a). Included in the information such agencies must provide is the purpose of the program to be funded, as well as the revenues, expenditures, program activities, and accomplishments for the preceding fiscal year, for the current fiscal year, for the budget year, and the four succeeding years. *Id.* The agency is required to include a statement explaining the methods and reasons for the estimates for receipts and expenditures. *Id.* The Governor, through the Secretary of the Budget, may make further inquiries and investigations concerning the budget requests, and may alter, approve, or disapprove them. *Id.* § 230(b). In due course, the Governor submits to the General Assembly the agency's budget request, including any desired revisions to the request. *Id.* § 233. The

Authority's proposed budget then is subject to rejection, alteration, consideration in hearings, legislative inquiries, and any other scrutiny that the political branches deem appropriate.

The flaw in the Commonwealth Court's analysis is that it conflated the Authority's creation of its budget request with the General Assembly's power to approve the appropriation. Although Subsection 5707(a) affords the Authority the opportunity to make the budgetary request and to be heard by the Governor and the legislative appropriations committees regarding its proposal, the General Assembly retains its core legislative prerogative to approve the appropriation or adjust it in either direction. Until the Governor submits the budget proposal and the General Assembly appropriates funds, the Authority has no budget. Similarly, the Authority's proposed fee schedule is subject to alteration by the Governor and General Assembly. Thus, neither Section 5707 nor Section 5710 cedes any legislative power to the Authority. Accordingly, there is no unconstitutional delegation of legislative power.

Certainly, the prohibition of the delegation of legislative power does not require the legislature to create an agency budget without input from that agency. The Authority is tasked with regulatory obligations under legislation passed by the General Assembly and is uniquely situated to assess the financial burdens of that regulation and to convey its conclusions in the form of a budget request.

Because Act 64 did not delegate legislative power when it tasked the Authority with the administrative function of submitting a proposed budget, the Commonwealth Court

erred in holding that Sections 5707 and 5710 constitute unconstitutional delegations of legislative power.[17]

To summarize, we conclude that the Commonwealth Court erred in holding that the assessment scheme of Subsection 5707(c) violated the substantive due process rights of partial rights taxicab owners. The Commonwealth Court further erred in concluding that Sections 5707 and 5710 constitute unconstitutional delegations of legislative power. Accordingly, we reverse the Commonwealth Court order, and we remand for further proceedings consistent with this opinion.

Chief Justice Saylor and Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.

---

[17] Germantown also raises an alternative argument that Section 5707(c) violates the Uniformity Clause and Germantown's equal protection rights. Because this issue is not encompassed within our grant of *allocatur*, we do not consider it.