**[J-94-2019] [MO: Saylor, C.J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| JASMINE WEEKS, VANESSA WILLIAMS, ARNELL HOWARD, PATRICIA SHALLICK, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : : : : : : | No. 22 EAP 2019<br><br>Appeal from the Order entered on August 1, 2019 in the Commonwealth Court at No. 409 MD 2019. |
| Petitioners | : : : | ARGUED: October 16, 2019 |
| v. | : : : : | |
| DEPARTMENT OF HUMAN SERVICES OF THE COMMONWEALTH OF PENNSYLVANIA, | : : : : | |
| Appellee | : | |

**DISSENTING OPINION**

**JUSTICE WECHT**                                        **DECIDED: December 18, 2019**

Of the six factors that one must satisfy to establish a basis for a court to enter a preliminary injunction pending final resolution of a constitutional challenge to a statute, the Department of Human Services ("DHS") contested only two in this case. The first of these requires Petitioners to establish that the injunction is necessary to prevent harm that could not be compensated fully by a later cash award, in the event that their constitutional challenge succeeds (*i.e.*, "irreparable harm"). *See Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1001 (Pa. 2003). The second factor at issue here requires Petitioners to establish that they are "likely to prevail on the merits,"

*id.*, a factor the meaning of which is less than clear in our case law.[1]  In resolving this appeal, the Majority has set the bar so high on the "likely to prevail" factor as to call into question whether preliminary injunctive relief can ever be granted without persuading the court, on a necessarily limited record, that the requesting party is *certain* to succeed on the merits.

A court should enter a preliminary injunction where such temporary relief will prevent "irreparable injury or gross injustice until the legality of the challenged action can be determined." *Fischer v. Dep't of Pub. Welfare*, 439 A.2d 1172, 1174 (Pa. 1982).  This Court reviews the entry of an order granting or denying a request for a preliminary injunction for an abuse of discretion.  *Marcellus Shale Coal. v. Dep't of Envtl. Prot.*, 185 A.3d 985, 995 (Pa. 2018).  We must determine whether "any apparently reasonable grounds" exist in the record to support the lower court's denial of the preliminary injunction.  *SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 506 (Pa. 2014).  But our law is clear that we should "not inquire into the merits of the controversy."  *Roberts v. Bd. of Dirs. of Sch. Dist. of City of Scranton*, 341 A.2d 475, 478 (Pa. 1975).  Yet, the Majority does exactly that.  Because I disagree with the Majority's broad approach, as well as its consequent conclusion regarding the narrow question we are called upon to answer, I respectfully dissent.

---

[1]     The moving party also must show that "greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceeding"; "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; "that the injunction it seeks is reasonably suited to abate the offending activity"; and "that a preliminary injunction will not adversely affect the public interest." *Summit Towne Ctr.*, 828 A.2d at 1001.  These factors are not before us.

**I. Petitioners established that they will suffer irreparable harm from the cessation of general assistance payments.**

Finding that Petitioners' request for an injunction fails on the likelihood of success factor, the Majority declines to address irreparable harm. *See* Maj. Op. at 13 (noting that the failure of any one factor is fatal to a request for a preliminary injunction). However, the lower court found that Petitioners had failed to establish irreparable harm, ostensibly because the action sought to be enjoined involves the termination of cash assistance. As such, according to the lower court, should Petitioners prevail on the merits, "Petitioners' 'harm' would consist of only a delay in receiving a cash benefit. The eventual receipt of the benefit repairs the harm." *Weeks v. Dep't of Human Servs.*, 409 M.D. 2019, Slip Op. at 5 (Pa. Cmwlth. Aug. 1, 2019) ("scare quotes" in original). In light of Petitioners' circumstances, this conclusion is patently untenable.

General Assistance is a program administered by DHS. Prior to the enactment of Act 12,[2] DHS disbursed up to $215 in monthly cash assistance payments[3] to individuals who are unable to work and have no other source of income because they have physical or mental disabilities, or they are pregnant, or they are victims of domestic violence receiving protective services from DHS, or they are enrolled in a substance abuse treatment program that imposes conditions precluding them from working, or they are non-parental caretakers of children under the age of thirteen or of an individual suffering

---

[2]    *See* Act of June 28, 2019, P.L. 42, No. 12.

[3]    There are two types of General Assistance: cash assistance and medical assistance. This appeal concerns only the legislature's elimination of the former, because Act 12 does not disturb General Assistance medical assistance. Unless context indicates otherwise, all references to General Assistance in this opinion concern cash assistance.

from a physical or mental disability. *See* 62 P.S. § 432(3). Speaking generally, to qualify for General Assistance, recipients must be penniless and lack any source of income.

These qualifying conditions provide critical context. As evidence of the irreparable harm they will suffer, Petitioners provided sworn declarations from ten General Assistance recipients, professionals from agencies that serve recipients, public officials who oversee programs serving recipients, and attorneys representing recipients, all of whom describe the specific harms recipients will suffer from the loss of these payments. Petitioners argue that the Commonwealth Court erred in deeming such harm "speculation and conjecture." *Weeks*, Slip Op. at 6 (citing *Reed v. Harrisburg City Council*, 927 A.2d 698, 706 (Pa. Cmwlth. 2007)).

Notwithstanding the Commonwealth Court's contrary suggestion, a party seeking preliminary injunctive relief need not establish the anticipated harm with certainty. The purpose of a preliminary injunction is to "prevent imminent and irreparable harm that *might* occur before the merits of a case can be heard and determined." *SEIU*, 104 A.3d at 500-01 (emphasis added). Thus, a party satisfies the irreparable harm factor when he or she establishes that a preliminary injunction is necessary to prevent anticipated harm to individuals' health and well-being. *See id.* at 508-09 (reducing public health services by closing of public health centers and eliminating nursing staff constituted immediate and irreparable harm).

Other courts have endorsed the common-sense expectation that eliminating General Assistance and similar programs is likely to disrupt recipients' lives in severe, immediate ways that belated monetary damages cannot undo. The Commonwealth Court, itself, has acknowledged as much:

[T]he cessation of public assistance payments would result in disastrous hardship and inhumane living conditions for a great number of assistance recipients. For [General Assistance] alone, over 145,000 persons in Pennsylvania are recipients with 26,000 of them being children. For the recipients, the [General Assistance] payments are normally the only means for obtaining shelter, clothing, utility services and transportation, while temporarily unemployed or while applying for social security benefits. Although these recipients receive food stamps, they usually must also use money from their public assistance grants every month after food stamps are exhausted.

*Knoll v. White*, 595 A.2d 665, 667-68 (Pa. Cmwlth. 1991); *accord Hill v. O'Bannon*, 554 F. Supp. 190, 197 (E.D. Pa. 1982) ("There can be no question that class members will suffer irreparable injury pending the litigation [over the termination of General Assistance] if injunctive relief is not granted. . . . By hypothesis, a welfare recipient is destitute, without funds or assets. His need for benefits has been characterized as a brutal need." (cleaned up)); *Nelson v. Likins*, 389 F. Supp. 1234, 1237 (D. Minn. 1974) ("While the loss of money is normally not considered irreparable, . . . those affected are not the average citizens but rather those who are in the grip of poverty. The loss to them of a certain sum of money each month is much more of an injury than it is to the average individual. And it is this average individual who is the basis for the rule that the loss of money is not considered irreparable harm.").

The sworn declarations of General Assistance recipients detail the extensive, multifarious harms they will suffer from the loss of benefits. Petitioners have demonstrated that the loss of General Assistance imminently threatens their ability to acquire basic necessities, diminishing their ability to see to their own well-being and that of their dependents. *See, e.g.*, Decl. of Patricia Shallick, 7/19/2019, ¶ 11 (Exh. E to Petition for Review) ("I already have no running water. Without General Assistance, I will have no way to use the laundromat to wash clothes, no way to buy the hand sanitizer and

wipes I need to clean myself without water . . . ."), Decl. of Michael McLaughlin, 7/17/2019, ¶ 9 (Exh. 4 to Application for Special Relief) ("I cannot afford to live without General Assistance. . . . I also will have no way to . . . pay my friends and family members who allow me to sleep on their couches."); Decl. of Arnell Howard, 7/16/2019, ¶¶ 12-13 (Exh. C to Petition for Review) ("I use the $205 I receive in [General Assistance] to make payments on the electric, gas, and water bills. I still owe money on all of these bills, but I have been able to keep all of my utilities on since I started getting [General Assistance]. . . . Without General Assistance, I will have no way to pay my utility bills.").

Further undercutting any suggestion that the harm is speculative are the testimonies of social service providers who served General Assistance recipients the last time the program was eliminated—by Act 80 of 2012. *See Washington v. Dep't of Pub. Welfare*, 188 A.3d 1135 (Pa. 2018) (deeming Act 80 unconstitutional).[4] Many submitted sworn declarations recounting their observations of human hardship in the aftermath. *See, e.g.*, Decl. of Marc Cherna, Dir., Allegheny Cty. Dep't of Human Servs., 7/16/2019, ¶ 9 (Exh. 9 to Application for Special Relief) ("For many people, losing General Assistance [in 2012] meant becoming housing unstable and/or homeless, as they were no longer able to keep up with rent or utilities, or afford security deposits to move into new housing."); Declaration of Ann Sanders, Pub. Policy Advocate, Just Harvest, 7/18/2019, ¶ 5 (Exh. 18 to Application for Special Relief) ("In the summer of 2012, [General Assistance] was eliminated, and we quickly saw an increase in the need for emergency

---

[4]    Although Act 80 was not held unconstitutional until 2018, General Assistance payments were suspended during the six-year pendency of that litigation. Thus, these service providers are well and recently acquainted with the consequences of terminating cash assistance.

food assistance, and an increase in homelessness."); Decl. of Kathy Wellbank, Program Dir., Interim House, Inc., 7/19/2019, ¶ 9 (Exh. 20 to Application for Special Relief) (noting that when General Assistance ended in 2012, "[w]omen returned to abusive partners to have a place to stay").

Petitioners have presented compelling evidence that losing General Assistance would impair their abilities to meet their most basic human needs. Recipients will suffer cascading and multiplying harms to their physical and mental health, impaired family relationships, and will endure manifold threats to their personal safety and well-being that monetary damages awarded at some remote time in the future cannot begin to rectify. Thus, I reject the Commonwealth Court's conclusion that Petitioners' showing was insufficient to support a preliminary injunction.

## II. Act 12's introduction, amendment, and enactment.

To assess the likelihood of success on the merits factor, we must situate Petitioners' constitutional challenge in its proper context. To do so, it is necessary first to review Act 12's journey from proposal to enactment.

In the wake of our July 18, 2018 decision in *Washington*, which deemed unconstitutional the General Assembly's 2012 bill eliminating General Assistance, legislative supporters of the invalidated law promptly resumed their efforts to eliminate General Assistance, introducing House Bill 33 only six months later, in January 2019. This bill was three pages long and made only three substantive changes to the Public Welfare Code: it defined "General assistance-related categorically needy medical assistance"; provided for the termination of the General Assistance program; and deleted Subsection 442.1(a)(3)(i) of the Public Welfare Code, which automatically classified an individual as "medically needy" and, thus, eligible for medical assistance if he or she

received General Assistance. H.B. 33, P.N. 0047. All of these provisions worked exclusively to terminate General Assistance cash payments while leaving related statutory provisions unchanged. This bill was considered twice by the full House and then re-committed to the House Appropriations Committee on March 27, 2019.

The Committee amended Bill 33 to add provisions that: (1) doubled the appropriation of funds to DHS (the existing appropriation was due to expire on June 30, 2019) to distribute to private nursing homes for fiscal year 2019-2020 under the "Nonpublic Nursing Facility Medical Assistance Day-One" program, an incentive program to encourage private nursing homes to accept more Medicaid patients; (2) reauthorized municipalities to levy annual assessments on "general acute care hospitals" and "high volume Medicaid hospitals," which authorization was also due to expire on June 30, 2019; (3) changed the eligibility requirements for hospitals to be classified as "high volume Medicaid hospitals"; (4) changed the definition of hospitals' "Net operating revenue" to "Net patient revenue," and changed the definitional criteria for "Net inpatient revenue," altering how the annual assessments are levied; and (5) allowed hospital assessments levied by municipalities to be paid to Medical Assistance managed care organizations for the provision of "health care services within the municipality." H.B. 33, P.N. 2182 (2019), §§ 4-8. This amended bill, now fifteen pages long, was reported out of the Appropriations Committee and passed by the full House on June 19, 2019, by a vote of 106-95. Bill 33 then went to the Senate, which passed it by a vote of 26-24 on June 26, 2019. Governor Wolf signed the bill into law on June 28, 2019. At the time he signed the bill, Governor Wolf noted his objection to the elimination of General Assistance payments, to which he

had repeatedly voiced opposition, but explained that other provisions of the bill effectively precluded his veto.[5]

### III. The Commonwealth Court had no reasonable basis for determining that Petitioners failed to establish a sufficient likelihood of success on the merits to support injunctive relief.

To establish a likelihood of success on the merits, Petitioners need not, and should not be expected to, prove the merits of the underlying claim. They "need only demonstrate that substantial legal questions must be resolved to determine the rights of the parties." *SEIU*, 104 A.3d at 506. As a general matter, of course, "[l]egislation enacted by the General Assembly enjoys a presumption of constitutionality." *Germantown Cab v. Phila. Parking Auth.*, 206 A.3d 1030, 1041 (Pa. 2019). Thus, to prevail on their claim, Petitioners ultimately must shoulder the heavy burden of showing that the legislative process by which the General Assembly enacted Act 12 "clearly and palpably violate[d] the Constitution." *Commonwealth v. Neiman*, 84 A.3d 603, 616 (Pa. 2013). However, to obtain preliminary injunctive relief Petitioners must establish only that a *substantial legal*

---

[5]     For various press reports on Governor Wolf's ambivalence and preference to preserve General Assistance, *see* Brief for Petitioners at 8-10. According to one report, after signing the bill, Governor Wolf "told reporters he was sorry he had to do it but the bill that the General Assembly sent him contained language that provided 'tens of millions of dollars for hospitals in areas that really need that money.' He added, 'In a perfect world I would not have to make this Hobson's choice.'" *Id.* at 10 (quoting Jan Murphy, "Dems: Revive Cash Assistance," *Patriot News*, July 5, 2019 (available at https://www.pennlive.com/news/2019/07/pa-democratic-lawmakers-want-to-revive-cash-assistance-for-states-poorest-residents-hoping-moral-compass-emerges-in-those-who-voted-to-shut-it-down.html). Although this Court's single subject case law has focused upon logrolling within legislative bodies, other courts have observed that the single-subject rule "prevent[s] the legislature from forcing the governor into a take-it-or-leave-it choice when a bill addresses one subject in an odious manner and another subject in a way the governor finds meritorious." *Hammerschmidt v. Boone Cty.*, 877 S.W.2d 98, 102 (Mo. 1994). Nothing in our constitution or case law suggests that we should interpret our single subject rule differently.

*question exists* concerning whether the enactment of Act 12 was infected by fatal constitutional deficiencies. They have done so.

Petitioners' constitutional challenges arise under Sections 1 and 3 of Article III of the Pennsylvania Constitution. Section 1 provides: "No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose." PA. CONST. art. III, § 1. This has come to be known as the "original purpose" requirement. Petitioners contend that the transformation of the bill from one originally tailored to eliminate General Assistance payments to one dominated by numerous unrelated assessment and disbursement provisions directed at a broad swath of health care providers fatally deviated from the bill's original purpose.

Section 3 provides: "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof." PA. CONST. art. III, § 3. Petitioners maintain that Act 12 in its final form embraced more than one subject, and, as such, violated Section 3.

We have explored at length the historical underpinnings of Sections 1 and 3 in *Washington* and earlier cases like *Neiman* and *City of Philadelphia v. Commonwealth*, 838 A.2d 566 (Pa. 2003). The voters adopted Article III, § 1, at the 1873 constitutional convention to resist the then-prevailing practice of attaching "riders" to an existing bill containing subject matter unrelated to the original subject of the bill. *Washington*, 188 A.3d at 1146. "[I]ts objective was to give legislators considering a bill sufficient notice of all of its provisions so that they might vote on it with circumspection." *Id.* (cleaned up).

To cure related abuses, Article III, § 3, first ratified by the voters in 1864, sought to prevent the use of "omnibus bills."

> [Omnibus bills] combined multiple pieces of legislation, each pertaining to a different subject, into one bill.  Limiting each bill to a single subject matter serves to ensure that every piece of legislation receives a considered and thorough review by legislators, and it safeguards the ability of all residents of the Commonwealth who will be impacted by a bill to have the opportunity to make their views on its provisions known to their elected representatives prior to their final vote on the measure.

*Washington*, 188 A.3d at 1146 (cleaned up).

The purpose of these and other Article III restrictions on the legislative process is undisputed:

> [T]o furnish essential constitutional safeguards to ensure our Commonwealth's government is open, deliberative, and accountable to the people it serves.  Such procedural requirements are integral to the preservation of the people's freedom from the yoke of secretive laws passed without full public awareness and debate.  Consequently, as these provisions are mandatory constitutional directives from the people, not mere advisory guidelines, the General Assembly must comply with them in the course of the legislative process.  For the same reason, *the judicial branch cannot ignore a clear violation because of a false sense of deference to the prerogatives of a sister branch of government.*

*Id.* at 1147 (cleaned up; emphasis added).  Thus, while we must grant the General Assembly the benefit of some degree of doubt, *see Germantown Cab*, *supra*, it is our duty to interpret the Constitution in a fashion that protects the citizens of the Commonwealth against the threat of "stealth legislation,"[6] which leaves legislators unaware of the full the contents of a bill, as well as the practice of "log-rolling," *i.e.*, "embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and

---

[6] This term is taken from John L. Gedid, *History of the Pennsylvania Constitution*, THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES 68 (2004) (Ken Gormley, ed.).

procuring its passage by combining the minorities who favored the individual matters to form a majority that would adopt them all." *Neiman,* 84 A.3d at 611 (Pa. 2013) (quoting *City of Phila.*, 838 A.2d at 586).

To comply with Article III, § 1, legislative amendments must be germane to, and not change, the original subject of the bill. *Washington*, 188 A.3d at 1151 (quoting *Stilp v. Commonwealth*, 905 A.2d 918, 959 (Pa. 2006)). Amendments to a bill are germane to its original subject only when the subject of the amendments and the subject of the original bill "have a nexus to a common purpose." *Washington*, 188 A.3d at 1151 (quoting *Neiman*, 84 A.3d at 612). Our Court also utilizes this "germaneness test" for a claimed single subject violation of Article III, § 3. In that connection, we compare the various provisions of an enactment to determine whether they are germane to a single subject matter. *Leach v. Commonwealth,* 141 A.3d 426, 433 (Pa. 2016)*.* The subject of the amendments and the subject of the original bill must constitute "a unifying scheme to accomplish a single purpose." *Id.* at 430 (quoting *City of Phila.*, 838 A.2d at 589). The general thrust of these combined constitutional requirements is that a bill not only must remain broadly faithful to its original subject, but also cannot become festooned during the amendment process with provisions that are not germane to that unifying subject.

In deference to legislative prerogatives, in considering whether amendments are germane to a bill's subject, a court may hypothesize a reasonably broad original purpose for the bill that encompasses the original text and amendments thereto, regardless of whether that hypothesized subject is proposed by the party defending the legislation or is conceived by the court of its own accord. However, when the court must hypothesize an

"unduly expansive" subject to sustain an enactment, the General Assembly has violated its mandate.  *See id.* at 1152.

Before Act 12 can be measured against these constitutional requirements for the limited purpose of assessing Petitioners' likelihood of success, it is necessary to recognize that the phrase is a term of legal art with parameters that have evolved over time and appeared in different guises.  Sometimes we describe the likelihood of success factor in surpassingly narrow language.  For example, we have held that "[a] preliminary injunction of any kind should not be granted unless both the right of the plaintiff is clear and immediate and irreparable injury would result were the preliminary injunction not granted."  *McMullan v. Wohlgemuth*, 281 A.2d 836, 840 (Pa. 1971).  In that case, we observed that the petitioner's right to relief was not "clear," because "[t]he legal issues raised are complex, and anything but free from doubt."  *Id.* at 841.  Similarly, in *Albee Homes, Inc. v. Caddie Homes, Inc.*, 207 A.2d 768 (Pa. 1965), we held that a preliminary injunction is appropriate only where "the plaintiff's right is clear and the wrong is manifest."  *Id.* at 771.  Self-evidently, though, to require that a petitioner establish that "the wrong is manifest" and the right to relief "clear" and "free from doubt," must be informed by the countervailing principle that a petitioner "*need not prove the merits of the underlying claim*" in seeking a preliminary injunction.  *See SEIU*, 104 A.3d at 506 (emphasis added).

In other decisions, however, we have described and applied a standard more harmonious with the idea that preliminary injunction proceedings should not become an arena to decide the underlying challenge.  In doing so, we have more convincingly married the likelihood of success factor to the underlying purpose of preserving the status quo while a substantial legal challenge is litigated fully.  Thus, we have explained:

> We have stated in many of our decisions that the movant must demonstrate a clear right to relief. However, since a preliminary injunction is designed to preserve the status quo pending final resolution of the underlying issues, it is obvious that the "clear right" requirement is not intended to mandate that one seeking a preliminary injunction establish his or her claim absolutely. Where the threat of immediate and irreparable harm to the petitioning party is evident, that the injunction does no more than restore the status quo and the greater injury would result by refusing the requested injunction than granting it, an injunction may properly be granted where substantial legal questions must be resolved to determine the rights of the respective parties.

*Fischer*, 439 A.2d at 1174 (cleaned up); *cf. Valley Forge Historical Soc. v. Wash. Mem. Chapel*, 426 A.2d 1123, 1129 (Pa. 1981) (hereinafter "*Valley Forge*") ("[W]here, as in the present case, the status quo sought to be altered has continued undisturbed for more than sixty years, the merits of the litigation cannot be reached until completion of discovery and full hearing, it is not clear that the petitioner's claim is purely speculative and the three prongs of the test for issuance of a preliminary injunction have been satisfied, it is unreasonable to deny injunctive relief pending a definitive ruling on the merits."[7]).

Our more recent case law generally has embraced this broader account. Thus, in *SEIU*, this Court held that "to establish a clear right to relief, the party seeking an injunction . . . need only demonstrate that substantial legal questions must be resolved to determine the rights of the parties." 104 A.3d at 506. And in *Marcellus Shale Coalition*, we repeated *SEIU*'s formulation, adding that the "substantial legal question" construct

---

[7] The *Valley Forge* Court perceived a simplified version of the test, relative to our contemporary six-factor formulation, although I count four factors rather than three. A close reading reveals that the difference is essentially semantic. None of the considerations in our six-factor formulation are alien to the earlier cases.

"implicates a less deferential standard . . . than would be applicable to a trial court's final merits determination." *Marcellus Shale Coal.,* 185 A.3d at 995.

The distinction is not trivial. As this case illustrates, parties seeking a preliminary injunction do so because harm is imminent and time is of the essence. Here, for example, the challenged law was not signed by the Governor until June 28, 2019, with the challenged provisions scheduled to take effect approximately one month later. Against this brief run-up to the commencement of Act 12's harmful effects, Petitioners simultaneously filed their petition for review and their request for a preliminary injunction on July 22, 2019. Thus, Petitioners filed both their challenge and their request for an injunction, including collecting numerous affidavits attesting to irreparable harm, fewer than four weeks after Governor Wolf signed the bill. DHS filed its response seven days later; Petitioners filed a reply the very next day; and the court ruled only two days after that without conducting the hearing that Petitioners had requested. Moreover, it did so in a six-page *per curiam* Memorandum Opinion and Order that dedicated only one conclusory paragraph each to the two factors that DHS argued were unsatisfied.

Such haste, necessary or advisable though it may be in addressing a request for a preliminary injunction in the face of imminent irreparable harm, invites abbreviated advocacy and hurried judicial assessments of the relative merit of constitutional challenges for purposes of determining the likelihood of success on the merits. However, no such haste is required in litigating the merits themselves. Indeed, the chief function of a preliminary injunction is, where warranted, to preserve the status quo while the underlying challenge runs its full course, with each side given ample opportunity to utilize all of the customary tools and the lengthier time periods typically granted litigants to fully

develop and advocate their positions. Put simply, to serve its purpose, a preliminary injunction must be litigated at a sprint, while the underlying constitutional challenge should more closely resemble a marathon.[8]

Before explaining my disagreement with the Majority's analysis, I first must emphasize that the Commonwealth Court's rejection of the likelihood of success factor relied upon clearly erroneous reasoning.[9] The court did not even seek to assess the potential constitutional merit of Petitioners' original purpose and single subject challenges. Instead, it relied upon its dubious objection to Petitioners' request that the court enjoin only those provisions of Act 12 that terminate General Assistance payments, allowing the various revenue and assessment provisions that did not affect those payments to continue in effect.

The court reasoned that Petitioners could seek preliminary injunctive relief only by insisting that the court enjoin operation of Act 12 in its entirety. *See Weeks*, Slip Op. at 5 (opining that Petitioners' "request for a piecemeal injunction of Act 12 is improper"). This conclusion appears to have arisen from a clear misapprehension of our decisions in *Neiman* and *City of Philadelphia*. Neither of those cases concerned a preliminary injunction. In both *Neiman* and *City of Philadelphia*, our Court rendered a *final* decision on the merits of single subject challenges to the statutes under review. Finding such violations, it was necessary to strike the unconstitutionally enacted statutes *in toto* to

---

[8] By way of example, this Court did not finally rule upon the constitutionality of Act 80 in *Washington* until approximately six years after its effective date.

[9] Finding an alternative reasonable basis for sustaining the lower court's denial of an injunction, the Majority declines to address the only basis the Commonwealth Court ventured to support its determination. *See* Maj. Op. at 5 n.3.

permanently rectify the constitutional violation. However, a preliminary injunction seeks not to finally determine the rights of the parties, but only to "preserve the status quo as it exists *or previously existed before the acts complained of,* thereby preventing irreparable injury or gross injustice." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1286 (Pa. 1992) (emphasis in original). Moreover, a preliminary injunction *must* be narrowly tailored in order to achieve that objective. *See Summit Towne Ctr.*, 828 A.2d at 1001 (citing *John G. Bryant, Inc. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1167 (Pa. 1977)) (preliminary injunction must be "reasonably suited to abate the offending activity"). Consistent with these principles, it is best to enter a preliminary injunction that enjoins only those provisions of a challenged legislative enactment that will cause irreparable harm if they take effect. Only if Petitioners were to prevail on the merits will the court be obligated to strike down Act 12 in its entirety. Neither *Neiman*, nor *City of Philadelphia*, nor any other case of which I am aware precludes issuing a preliminary injunction of the narrow scope that Petitioners have sought, where it is fashioned to abate irreparable harm while doing no violence to the continued operation of provisions that are not alleged to cause such harm.

In any event, the Commonwealth Court conducted no analysis of Petitioners' likelihood of prevailing on their substantive challenges. However, the Majority directly confronts, and unequivocally rejects, the merits of Petitioners' constitutional challenges to Act 12. I address the Majority's analyses in the order in which it presents them.

First, the Majority addresses Article I, § 3's single subject requirement, and cites numerous opinions in which single subject challenges were successful,[10] before examining two decisions by this Court denying such challenges.  *See* Maj. Op. at 9-10 (reviewing *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 877 A.2d 383 (Pa. 2005) (hereinafter, "*PAGE*"); *Spahn v. Zoning Bd. of Adjustment*, 977 A.2d 1132 (Pa. 2009)).  In *Spahn*, the bill at issue amended the Home Rule Act, which affects only first-class cities, *i.e.*, the City of Philadelphia.  The original bill at issue increased penalties and forfeitures for violations of the Philadelphia Code, modifying 53 P.S. § 13131 concerning the Home Rule Act's "[g]eneral grant of power and authority." *Spahn*, 977 A.2d at 1148.  The amendment that challengers suggested rendered the bill violative of the single-subject rule addressed standing in an amendment to Section 13131's companion provision, 53 P.S. § 13131.1, defining "[s]pecific powers." *Spahn*, 977 A.2d at 1148.  This Court rejected the single-subject challenge because "both proposed amendments involved changes directly related to the grants of powers and limitations on Philadelphia Home Rule," a "single unifying subject" that passed constitutional muster.  *Id.* at 1148-49.

In *PAGE* as well, this Court found no single subject violation.  The statute at issue in *PAGE* had begun as a one-page bill that concerned only the Pennsylvania State Police's support role in "performing criminal history checks and the verification of fingerprints of applicants for licensure under the Race Horse Industry Reform Act of 1981." *PAGE*, 877 A.2d at 391.  Before the bill's third and final consideration in the

---

[10] The Majority collects cases finding single subject violations decided by this Court and the intermediate appellate courts, *see* Maj. Op. at 8 & n.5, but discusses at length only this Court's decision in *City of Philadelphia, supra.  See id.* at 6-7.

Senate, amendments increased the bill to 145 pages in length, including seven chapters and eighty-six sections. A bill that started as one concerning only background checks under a 1981 Act governing horse-racing now created the Pennsylvania Gaming Control Board, and included a panoply of licensing, regulatory, and revenue generation and disbursement issues orbiting around the General Assembly's legalization of slot machine casinos. In addition to creating the Pennsylvania gaming industry from whole cloth, the bill in *PAGE* touched upon such disparate topics as economic development and tourism, property tax relief, and other matters with attenuated connections to the burgeoning industry. *Id.* at 392.

The Court divided the single-subject challenge into two discrete concerns. First, the Court found a single unifying subject, specifically "the regulation of gaming," which was not as broad as "municipalities," the subject the Court found unsustainably broad in *City of Philadelphia*. *Id.* at 396. In the second phase of its analysis, the Court separately considered the argument that the many provisions governing the bill's distribution of gaming revenues lay outside the purpose of the bill, which challengers characterized as "development of the 'horse race industry.'" *Id.* Under the amended act, gaming revenues would be distributed to airports, convention centers, urban development debt service, volunteer fire departments, general law enforcement, and other disparate public purposes. This Court identified this issue as implicating "a more specialized aspect" of single subject law, concerning the "creation and treatment of special funds generated ancillary to substantive legislation." *Id.* at 397. The question was whether "a source-only subject nexus" passes the germaneness test—*i.e.,* whether the fact that the monies in question derived from gaming brought the specifics of those monies' disbursement under

gaming regulation's umbrella. *Id.* Ultimately, this Court found that the "source-only" nexus sufficed.

In applying these cases presently, the Majority posits the following unifying subject:

[Act 12] as a whole relates to the provision of benefits pertaining to the basic necessities of life to certain low-income individuals. Some of these benefits may be in the form of cash assistance for such items as basic utility services, food, clothing, and personal hygiene products, while others may be supplied through medical or nursing-home care, the delivery of which is incentivized by payments to providers. Regardless, such a topic is, in our view, both unifying and sufficiently narrow to fit within the single-subject rubric as that concept has been spelled out in the reported decisions of Pennsylvania appellate courts.

Maj. Op. at 10. Hence, the Majority not only finds no *substantial question* with regard to the single-subject challenge, the only question we are called upon to consider, but it effectively *decides* that question on the merits in favor of DHS, the consummation of its decision a mere formality on remand.

With regard to Article III, § 1, the Majority relies upon our decision in *Stilp*. In that case, this Court explained that, in assessing an alleged original purpose violation, a court "must consider the original purpose of the legislation in 'reasonably broad terms,' compare it to the final purpose, and then decide whether there has been an alteration or amendment that changed the original purpose." *Stilp*, 905 A.2d at 956 (quoting *PAGE*, 877 A.2d at 409).

*PAGE* provides important insight into the care we must take to honor the constitutional original purpose directive. In *PAGE*, this Court offered a corrective to its earlier decision in *Consumer Party of Pa. v. Commonwealth*, 507 A.2d 323 (Pa. 1986), which had diverged from the original purpose (as it were) of Article III, § 1. *PAGE* described the flaws of the then-prevailing *Consumer Party* approach as follows:

A unanimous Court, while stressing the mandatory nature of Article III, Section 1, set a very high bar for finding a violation of this provision. Our Court recognized the practical realities of passing legislation and narrowly focused the inquiry. It reached its decision that Article III, Section 1 was not violated, not by comparing the original purpose to the purpose at final passage, but by considering only the bill at final passage. Consistent with this concentration, our Court inquired as to whether the legislation put the members of the General Assembly and others interested on notice so that they could "act with circumspection." [*Consumer Party*, 507 A.2d at 335.] As stated by the Court, "here the bill in final form with a title that clearly stated its contents, was presented to each house for its consideration and adoption. Under these circumstances, there is no basis for sustaining a challenge under Article III, Section 1." *Id.*

* * * *

Upon closer inspection of our now close to twenty-year-old decision, we find that the analysis offered in *Consumer Party* resembles the analysis set forth for reviewing challenges under Article III, Section 3 and fails to give full significance to the language employed in the constitutional provision itself—"change its original purpose." This verbiage certainly suggests a comparative analysis, that is, some form of comparison between an "original" purpose and a final purpose to determine whether an unconstitutional alteration or amendment has occurred so as to change the original purpose of the bill. . . .

[W]e now hold that a court entertaining a challenge to legislation under Article III, Section 1 must conduct a two-part inquiry. First, the court will consider the original purpose of the legislation and compare it to the final purpose and determine whether there has been an alteration or amendment so as to change the original purpose. Second, a court will consider, whether in its final form, the title and contents of the bill are deceptive.[11]

*PAGE*, 877 A.2d at 407-09.

The Majority gleans from *Stilp* the proposition that "a potential unifying purpose is not judged solely according to the provision with which the bill started, but by reference to a sufficiently broad (albeit not overly-broad) purpose within which all the amendments in the final bill may also fit." Maj. Op. at 12. I question whether this approach is true to

11    Petitioners do not claim in this case that the title of Act 12 is misleading.

the purpose of Section 1, as described by the Court in *PAGE*, which called for a reasonably broad account of the original purpose *followed* by the prescribed comparison to subsequent amendments.

The least we can ask is that any reasonably broad subject we superimpose upon a bill for purposes of original purpose analysis should be one that a reasonable reader might glean from the original text without the benefit of hindsight informed by later amendments. The Majority finds that the same unifying purpose quoted above necessitates a ruling in favor of DHS. By implication, then, we must assume that a reasonable reader might describe a bill that in its original form only contained provisions specifically tailored to *eliminate* General Assistance payments as "relat[ing] to the provision of benefits pertaining to the basic necessities of life to certain low-income individuals." Maj. Op. at 11.

On the substance of this point, filtered through the narrow reasonable likelihood of success inquiry to which we should limit our consideration, I find this Court's decision in *Washington* especially instructive. In that case, the Court held that Act 80, the legislature's earlier attempt to eliminate General Assistance payments, was unconstitutional under Article III, § 4, of the Pennsylvania Constitution and did not definitively rule on the alternative original purpose and single subject challenges. However, we strongly suggested that the ultimate bill in that case, which in material ways anticipated Act 12 in subject matter and scope, would not survive a single subject challenge. Specifically, the Court expressed skepticism that germaneness could be achieved under the proposed subject, "the regulation and funding of human service programs regulated by [DPW]." *Washington*, 188 A.3d at 1154 n.36. We found that

formulation "entirely too expansive, as it involve[d] a wide panoply of human service programs established by a multiplicity of statutes, not all of which are contained in the Public Welfare Code." *Id.* Moreover, we specifically found a nursing home assessment program not unlike the assessments added by amendment to Act 12 in this case to be unlike other provisions, including those terminating General Assistance payments. *Id.* The Majority's proposed purpose appears to me very nearly as broad as the one we characterized in *Washington* as "entirely too expansive." At a bare minimum, this aspect of our decision in *Washington* makes it difficult to conclude that Petitioners do not present a substantial germaneness question with implications for their original purpose and single subject challenges.

In issuing its apparently conclusive assessment of the merits of the underlying challenge, the Majority illustrates why a merits challenge should be litigated outside the context of the preliminary injunction inquiry and in the fullness of time. The degree to which it has preempted what might be more thoroughly developed is best illustrated in the above-quoted passage, which I reproduce for ease of reference:

> [Act 12] as a whole relates to the provision of benefits pertaining to the basic necessities of life to certain low-income individuals. Some of these benefits may be in the form of cash assistance for such items as basic utility services, food, clothing, and personal hygiene products, while others may be supplied through medical or nursing-home care, the delivery of which is incentivized by payments to providers. Regardless, such a topic is, in our view, both unifying and sufficiently narrow to fit within the single-subject rubric as that concept has been spelled out in the reported decisions of Pennsylvania appellate courts.

Maj. Op. at 10.

The Majority's conclusion assumes far more than it explains. Who are the "certain low-income individuals" benefitted by the various hospital assessments and incentives? Do they substantially overlap or subsume the narrow class of approximately 12,000

General Assistance recipients represented by Petitioners in this case, the only people affected by House Bill 33 in its original form?  Are the incentive payments to providers earmarked for medical care to General Assistance cash recipients or anyone else, or is that left to the discretionary disbursement of hospital administrators?  Relatedly, may any class of those providers fulfill their obligations even if they render no services to General Assistance cash recipients at all?  Precisely what medical or nursing home care is facilitated by the non-General Assistance provisions of Act 12—to whom, in what fashion, and to what end?  In what specific way is the delivery of such care "incentivized" by Act 12?  In what direct way do General Assistance recipients benefit from any of these provisions?  How much narrower is the Majority's proposed subject, really, than "the regulation and funding of human services programs regulated by" DHS, which we pointedly called into question in *Washington*?

Some of these questions may find answers in statutes, others in regulations promulgated thereunder.  Still others may require factual inquiries.  What matters, though, especially with respect to any fact-finding that may be warranted, is that these questions have not yet been *litigated* in search of the correct merits ruling, and the lower court should be the first tribunal to assess the relevance and effect of these questions. *Cf. Valley Forge*, 426 A.2d at 1129 (deeming it "unreasonable to deny injunctive relief pending a definitive ruling on the merits" where "the merits of the litigation cannot be reached until completion of discovery and full hearing").  But the Majority either assumes their answers or deems them irrelevant to the constitutional inquiry, effectively denying Petitioners an opportunity to fully develop their challenges and present them to the lower court.

In light of these concerns, and informed by what I believe to be a fair understanding of the competing interests that a court must balance in determining whether to grant injunctive relief, I believe that Petitioners have demonstrated that substantial legal questions exist regarding whether the General Assembly satisfied Article III, §§ 1 and 3, in enacting Act 12, questions we acknowledged and indeed fueled in *Washington*. These questions deserve a full and fair hearing in the Commonwealth Court, without this Court's heavy thumb on the scale. In tandem with the other relevant factors,[12] these questions support the entry of preliminary injunctive relief pending a final determination.

It is not at all clear that there is a common nexus between the subject of the original bill, ending General Assistance payments, and that of the later amendments, the generation and disbursement of revenue for the provision of health care services, such that they may be considered part of a unifying scheme to accomplish a single overarching purpose discernible in the original bill. This same problem suggests an open single subject question as well. That we can identify *sound* reasons for rejecting Petitioners' constitutional challenges on the merits—perhaps by analogy to *Spahn* and *PAGE*, as the Majority has it—does not by itself warrant the conclusion that there is no sound basis for the lower court to rule in Petitioners' favor after full development and advocacy, an outcome perhaps sustainable under *City of Philadelphia* as informed by our *dicta* in *Washington*. All we should be determining in this necessarily abbreviated proceeding is whether Petitioners have presented a *substantial* question, and these competing cases

---

[12] DHS's perfunctory refutations of the remaining four factors were little more than boilerplate, and they do not even mention them on appeal, despite the fact that Petitioners address them in their brief to this Court.

illustrate that they have. The standard articulated in *SEIU* and *Marcellus Shale Coalition* requires no greater showing.

Given the magnitude of the harm to General Assistance recipients, the apparent lack of substantial countervailing harm to DHS, and the lower court's cursory and at least partially erroneous resolution of the relevant questions, I discern no reasonable basis for sustaining that court's denial of Petitioners' request for preliminary injunctive relief. Thus, I would conclude that Petitioners met their burden of demonstrating their likelihood of success on the merits in light of the substantial legal questions that exist regarding the constitutionality of Act 12 under Article III, §§ 1 and 3, and that their harm is irreparable. Accordingly, I would reverse the lower court's order.

### IV. The Majority's analysis renders the proceedings on remand an unnecessary formality.

This leads me to a final observation. The Majority leaves no doubt about how it views the merits of the underlying challenge, even if it closes by framing its disposition relative to our deferential standard of review. *See* Maj. Op. at 13 (finding that the lower court "did not abuse its discretion in determining that [Petitioners] failed to carry their burden with regard to the likelihood-of-success-on-the-merits aspect of the standard for preliminary injunctive relief"). Nothing about the Majority's observations suggests that its views of the original purpose and single subject challenges are provisional or will change in light of further proceedings below. Indeed, it defies credulity to speculate that the Commonwealth Court, confronted with the Majority's analysis, might rule in Petitioners' favor.

Notably, this Court may exercise extraordinary jurisdiction under the Judicial Code:

Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any

court or magisterial district judge of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done.

42 Pa.C.S. § 726. Clearly, this litigation involves a matter of immediate public importance. At Petitioners' invitation, the lower court and this Court have considered and decided the injunction litigation on an expedited basis. Although extraordinary jurisdiction "is invoked sparingly and only in circumstances where the record clearly demonstrates the petitioners' rights," *Bd. of Revision of Taxes, City of Phila. v. City of Phila.*, 4 A.3d 610, 620 (Pa. 2010), the Majority's opinion leaves no practical doubt how it views the rights of the parties. Under such circumstances, it would be better simply to put the matter to bed than to invite parties, attorneys, and the lower court to continue to litigate a *fait accompli*.